THE STATE OF OHIO, APPELLEE, *v.* HOOD, APPELLANT.*

[Cite as *State v. Hood,* 134 Ohio St.3d 595, 2012-Ohio-5559.]

*Evidence—Criminal law—Confrontation Clause—Admission of cell-phone records—Cell-phone records, if properly authenticated, are business records and are not testimonial under* Crawford v. Washington—*If not authenticated, cell-phone records are inadmissible hearsay— Authentication may be provided only by custodian or other witness who is qualified to testify that records were kept in ordinary course of regularly conducted business—Error in admission of evidence harmless when other evidence of guilt is overwhelming.*

(No. 2010-2260—Submitted November 2, 2011—Decided December 3, 2012.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 93854, 2010-Ohio-5477.

_____

PFEIFER, J.

{¶ 1} The issue we address in this case is whether, in general, cell-phone records produced by a cell-phone company constitute testimonial evidence that implicates a defendant's right to cross-examine a witness under the Confrontation Clause of the Sixth Amendment to the United States Constitution. We hold that ordinarily such records, if properly authenticated, are business records and are not testimonial. However, in an instance where cell-phone records are not properly authenticated at trial, they are inadmissible as hearsay and their admission violates a defendant's rights under the Confrontation Clause. In this case, we find that the admission of the cell-phone records was error but that that error was harmless beyond a reasonable doubt.

*Reporter's Note: This decision was vacated on December 31, 2012. See opinion on reconsideration that appears at 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057.

**Factual and Procedural Background**

{¶ 2}   In the early morning hours of January 26, 2009, defendant-appellant, James Hood, allegedly was one of four men who burst into a Cleveland home and robbed at gunpoint nearly a dozen people who had gathered to celebrate the birthdays of friends and family.  A co-conspirator, Samuel Peet, was shot dead during the course of the robbery.  Hood was arrested and charged with murder and multiple counts of aggravated burglary, aggravated robbery, and kidnapping.  As part of the proof to establish Hood's involvement in the crimes, the state introduced cell-phone records that it argued showed his communication with the other co-conspirators and his whereabouts during the early morning in question.  The issue we address is whether the introduction of that evidence violated the Confrontation Clause of the Sixth Amendment to the United States Constitution.

The Crime

{¶ 3}   In the late evening of January 25, 2009, a group of friends gathered in the basement of Sharon Jackson's home on Parkview Avenue in Cleveland to play cards and celebrate the birthdays of Denotra Jones and her son, Rodney.  Among the guests that evening was one of the alleged co-conspirators, Terrence Davis, also known as "TD."  According to Rodney Jones, Davis's presence was unusual: Davis had not joined the group in over a year, and he left the party several times throughout the evening.  Davis had met earlier that day with Samuel Peet and the other co-conspirators—Hood and Kareem Hill—and told them about the party.

{¶ 4}   Jerrell Jackson, homeowner Sharon Jackson's son, was the first person to be confronted by the assailants.  He had walked some guests to their cars at around 5:00 a.m.; when he went back inside, there were four men in the hallway wearing masks and carrying guns.  Jerrell noticed that one gun was an Uzi.  Jerrell ran down into the basement, yelling a warning to everyone.  Sharon Jackson, who had fallen asleep on a couch in her basement, was awakened by the

commotion; she saw Jerrell being followed into the basement by four men wearing masks and carrying guns. She described the guns as two 9 mm handguns, one Uzi, and one handgun with a long chrome barrel. The robbers made the victims strip, then searched the clothing and took money and cell phones.

{¶ 5} Nine of the eleven victims testified at trial. They described the same basic facts—men in dark clothing, wielding guns, stormed into the basement, ordered some of the victims to remove their clothes, and stole money and cell phones from them at gunpoint. Some witnesses differed on the number of assailants, ranging from two to four, but the victims were robbed in two separate rooms of the basement. At some point, gunshots were heard. One of the co-conspirators, Peet, was later found dead nearby, in a yard several houses away. Several of the victims were able to identify him as one of the assailants due to his distinctive coat. He had been shot twice from close proximity; on his body were two cell phones belonging to victims and $345 in cash.

{¶ 6} Earlier that morning, around 4:00 a.m., police received a report of a male pointing a gun at another male in the area of East 104th Street and Sophia Avenue, near where Hood lived. En route to the scene, the officers observed a green Jeep Cherokee stopped in the middle of Parkview Avenue with its lights on. As the officers approached, the Jeep sped away. The officers pursued the Jeep and were able to get a partial plate number, "EOF," before losing sight of the vehicle. The same officers were called to help investigate the Parkview Avenue break-in and were told that a sport utility vehicle was involved in the crime. Shortly after the break-in, a green Cherokee, license plate number EOF 7079 was spotted at a local McDonald's. Hood, his co-defendant Kareem Hill, and William Sparks were removed from the vehicle and arrested. Cash, a mask, and two victims' cell phones were found inside. At the time of his arrest, Hood had $411.25 in cash in his possession. Hill eventually testified against Hood.

Kareem Hill's Testimony

{¶ 7}   Hill initially lied to police and denied any involvement in the crimes.  But when a latex glove found at the scene tested positive for Hill's DNA, Hill pleaded guilty to reduced charges and agreed to testify truthfully against Hood.

{¶ 8}   Hill knew his co-conspirators Hood, Davis, and Peet from the neighborhood where he grew up.  Hill was 18 at the time of the crimes; Hood was older—he was 29 at the time of the trial, according to his attorney.  In the hours before the robbery, Hill and Hood met Davis and Peet at a bar.  The four discussed robbing a card game on Parkview Avenue.  Davis left the bar to go to the party.  Davis eventually returned to the bar and laid out the specifics about the party situation.

{¶ 9}   They all left the bar—Davis and Peet in one car, and Hill and Hood in Hill's green Jeep Cherokee.  Hood and Hill went to Hood's house on Sophia Avenue to pick up guns.  Hood went into his house and returned to the vehicle with a semiautomatic pistol, an Uzi, and latex gloves.  Hill and Hood then drove to Parkview Avenue, where they saw Peet standing in a driveway near the target house; they let Peet get into the back seat of the Jeep.  Peet had a gun.

{¶ 10} The three waited in the car.  When Davis approached and informed them that the back door of the target house was open, Hood and Peet left the vehicle while Hill parked on the next street.  Hill then cut through back yards to meet the others.  All had weapons and wore hats or masks; Hill, Hood, and Davis wore latex gloves.  Hill carried a black handgun, Peet carried a long silver revolver, Davis carried a black pistol, and Hood carried an Uzi.

{¶ 11} Hill testified that he and his cohorts took money and cell phones from the victims.  At one point, there was an argument between Hood and Peet—Hood had accused Peet of stealing money from the pile of cash that was to be divided. Davis broke up the altercation by announcing that it was time to leave.

{¶ 12} Hill ran up the stairs and outside; he was outside when he heard gunshots from inside the house. He never saw Peet leave the house. Hill and Hood left in Hill's Jeep while Davis went off in another direction.

{¶ 13} Hill and Hood returned to Hood's house on Sophia to drop off the guns. Hood went inside. Hood returned to the Jeep, and the two picked up Hill's friend William Sparks, who, Hill said, had called him for a ride to McDonald's. Hill let Sparks drive. They went to McDonald's, where police stopped and arrested the three. The state ultimately did not pursue charges against Sparks.

Cellular-Phone-Record Testimony

{¶ 14} At trial, the prosecution introduced cell-phone records for Hood, Hill, and Davis that detectives claimed to have subpoenaed from cellular-phone companies. Detective Carlin described the subpoena process:

> We have to go to a county prosecutor. We can't just go and say we want these records. The phone companies have rules on that. They just don't give them out.
>
> We obtain an authorization for a subpoena and then we respond to—there is a subpoena person in the prosecutor's office * * *. We provide them with the numbers, they then type up the subpoenas, and based on their records and their relationship with the phone companies, they know, with the prefix numbers, what company that subpoena needs to go to and they direct the subpoena to that company.

{¶ 15} Carlin testified that the cell-phone records were obtained through that process; however, the subpoenas are not in the record.

{¶ 16} The records purport to show cell-phone activity by Hood, Hill, and Davis on the night and early morning in question. During Hill's testimony, the

prosecution used the records to ask Hill about certain calls that were placed by his phone or received by his phone. Those calls included ones made by Hill's cell phone to Davis's cell phone and vice versa, some right around the time of the crimes. Indeed, Detective Carlin testified that Davis first became a suspect in the robberies when the phone records were reviewed. There was also a call from one of the stolen cell phones to Hill's phone; Hill claimed that Hood had called Hill's number to see whether the stolen phone worked. The records showed Hill trying to contact Davis several times just before and after the robberies; Hill testified that Hood borrowed his phone to make those calls.

{¶ 17} When the prosecution first attempted to use cell-phone records in its direct examination of Hill, the defense objected, claiming that the records lacked verification or certification of their authenticity. The prosecution argued that the records fell under the business-records exception to the hearsay rule and that Hill could verify the records based on his own knowledge. The court determined that the prosecution could use the records to have Hill testify as long as another witness would authenticate the records. The prosecutor stated that Detective Carlin, who subpoenaed the records, would testify as to how she obtained them. The defense argued that Detective Carlin could not authenticate business records of another entity and entered a continuing objection on the record.

{¶ 18} On cross-examination, the defense used the phone records to poke holes in Hill's version of events. For instance, phone records showed that someone used Hill's cell phone to call Hood's cell phone at 2:42 a.m. Hill could not explain why he would have called Hood at a time when, according to Hill, the two men were a few feet apart, in the same car.

{¶ 19} After the cross-examination, Hood renewed his objection to the cell-phone records after the state related that it would use Detective Carlin's partner, Detective Henry Veverka, to verify the records. The trial court remarked

6

at that time: "I've done the case law research on it and my gut reaction is to subpoena Verizon on that basis. I guess Veverka would just have to come in and say that he issued it, how he's familiar with the business records of the company. That would be the testimony that would be proper."

{¶ 20} Detective Veverka testified that the records were obtained through subpoena. He also testified about his experience interpreting cell-phone records, which he learned mostly on the job through other detectives, including experience in using information from providers to determine geographic locations of the cell phone at the time calls were made, based upon cell-tower data. Veverka testified that Hood did not have his cell phone with him at the time of his arrest. He reviewed call logs for the days at issue, as well as cellular-tower records. He testified as to State's Exhibit 187, which contained tower records for Hood's cell phone. Those records indicated which cell tower Hood was near when he used his phone.

{¶ 21} Through the records, Veverka was able to ascertain that between 10:00 p.m. through 3:00 a.m., 15 calls were made or received on Hood's phone. The last of those 15 calls was at approximately 2:42 a.m.; the next call was at 6:24 a.m. He was able to determine through tower records that Hood was in the vicinity of the robbery when he used his cell phone. Through another record containing a log of calls to and from Hood's cell phone, Veverka was able to determine the dates and duration of the calls and the phone numbers involved.

{¶ 22} From his examination of the cell-phone records, Veverka concluded that Hood, Hill, and Davis were all in the vicinity of the targeted house at the time the robberies were committed.

{¶ 23} Defense counsel cross-examined Veverka. He admitted that although he knew more about interpreting cell-phone records than his fellow detectives, he did not have any expertise in cell phones or towers. He admitted being unaware that different towers have different powers and admitted that

phone company experts could provide maps and charts showing which towers serve which areas.

{¶ 24} The records Veverka testified about were admitted into evidence. The documents sent to the jury contained some alterations by the detective—he wrote the phone numbers of the suspects on the documents and color-coded the records to highlight phone calls involving the different participants in the robbery. Hood's counsel objected, stating that the records had not been verified as a business record, had not been identified by any phone company, and contained the detective's personal notes, and that the alleged subpoenas were not in the record. The trial judge overruled the objection.

Verdict and Appeal

{¶ 25} The jury convicted Hood on one count of murder pursuant to R.C. 2903.02(B), "caus[ing] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree," and acquitted him on one count of murder as defined in R.C. 2903.02(A), "purposely caus[ing] the death of another." Further, the jury convicted Hood of nine counts of kidnapping, nine counts of aggravated robbery, and one count of aggravated burglary, as well as two firearm specifications for each count, which were merged for purposes of sentencing into a single specification. The trial court had granted Hood's motion for acquittal on two counts of kidnapping and two counts of aggravated robbery when two of the victims failed to testify. The court ultimately sentenced Hood to an aggregate term of 21 years to life in prison.

{¶ 26} Hood appealed his convictions to the Eighth District Court of Appeals; among other things, he argued that the trial court had erred "by allowing cell phone records to be admitted into evidence without being properly authenticated in violation of the Confrontation Clause." The appellate court held that "[a]ssuming arguendo that these records were inadmissible and violative of

8

appellant's right to confront the witnesses against him, any error on the part of the trial court in this regard was harmless." *State v. Hood*, 8th Dist. No. 93854, 2010-Ohio-5477, ¶ 27. The appellate court applied the harmless-error standard applicable to constitutional error:

> Before constitutional error can be considered harmless, we must be able to "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705. Where there is no reasonable possibility that the unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal. *State v. Lytle* (1976), 48 Ohio St.2d 391, 358 N.E.2d 623, paragraph three of the syllabus, vacated on other grounds in (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.

*Id.*

{¶ 27} The appellate court determined that the admission of the cell-phone records did not contribute to Hood's conviction and affirmed the judgment of the trial court.

{¶ 28} Hood sought jurisdiction in this court on the following proposition of law:

> Cell phone records are not admissible as business records without proper authentication. The admission of unauthenticated cell phone records under the business records exception violates the Confrontation Clause of the Sixth Amendment to the United States Constitution.

{¶ 29} The matter is before this court upon the acceptance of a discretionary appeal. 128 Ohio St.3d 1411, 2011-Ohio-828, 942 N.E.2d 384.

**Law and Analysis**

Confrontation Clause

{¶ 30} The Sixth Amendment to the United States Constitution, in its Confrontation Clause, preserves the right of a criminal defendant "to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court of the United States stated that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." The key issue is what constitutes a testimonial statement: "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006).

{¶ 31} In *Crawford*, the court suggested that business records are "by their nature" nontestimonial. *Id.* at 56. In *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, this court stated that business records "are not 'testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are "by their nature" not prepared for litigation.' " *Id.* at ¶ 82, quoting *People v. Durio*, 7 Misc.3d 729, 734, 794 N.Y.S.2d 863 (N.Y.Sup.Ct.2005). Whether a business record meets a hearsay exception is immaterial in regard to the Confrontation Clause; it is the nontestimonial character of the record that removes it from the purview of the Confrontation Clause:

> Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

{¶ 32} A Confrontation Clause issue can arise " if the regularly conducted business activity is the production of evidence for use at trial." *Id.* at 321. In *Melendez-Diaz*, for instance, the items of evidence at issue were reports by a company that provided forensic analysis on seized substances to establish whether they were illegal.

{¶ 33} But the regularly conducted business activity of cell-phone companies is not the production of evidence for use at trial. The fact that records are used in a trial does not mean that the information contained in them was produced for that purpose. Even when cell-phone companies, in response to a subpoena, prepare types of records that are not normally prepared for their customers, those records still contain information that cell-phone companies keep in the ordinary course of their business. In *United States v. Yeley-Davis*, 632 F.3d 673, 679 (10th Cir.2011), the defendant argued that the documents produced by the cellular-phone company were not merely phone records but were instead exhibits prepared especially for trial to prove the commission of a crime. The information contained in the exhibits was similar to that contained in the exhibits at issue in this case: "The phone records provide information about each call made or received by Ms. Yeley-Davis's number, including the number making the call, the number receiving the call, and the date and duration of the call." *Id.* at 677. The court rejected the defendant's argument:

> Ms. Yeley-Davis contends that the phone records and authenticating documents in Exhibit 5 are testimonial because they were prepared solely for use at trial to prove the conspiracy. * * * Specifically, she argues that the records were not telephone bills, but rather "exhibits prepared especially and only for trial." * * * Ms. Yeley-Davis is correct that the phone records in Exhibit 5 are not telephone bills. This does not mean, however, that these records were created simply for litigation—they were not. Rather, these records were kept for Verizon's business purposes.

*Id*. at 679.

{¶ 34} Likewise, in *United States v. Green*, 396 Fed.Appx. 573, 575 (11th Cir.2010), the court held that subpoenaed records from the defendant's cell-phone carrier were not testimonial: "[The defendant's] cell phone records and cell tower location information qualified as business records under Fed.R.Evid. 803(6) which, by their nature, are non-testimonial for purposes of the Sixth Amendment." The court noted that "documents which are routinely recorded for a purpose other than preparation for a criminal trial are non-testimonial for purposes of the Sixth Amendment." *Id*. at 574-575.

{¶ 35} Unlike the laboratory reports that the court found to be testimonial in *Melendez-Diaz* or *Bullcoming v. New Mexico,* ___ U.S. ___, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the culling and configuration of cell-phone records does not require the undertaking of a scientific process or an interpretation of results from experimentation. It reflects only a formatting of information that already exists as a part of the company's day-to-day business.

Authentication of Business Records

**{¶ 36}** Because cell-phone records are generally business records that are not prepared for litigation and are thus not testimonial, the Confrontation Clause does not affect their admissibility. But the hearsay rule may bar their admission unless certain conditions are met:

> "To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.' "

*State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 171, quoting Weissenberger, *Ohio Evidence Treatise*, Section 803.73, 600 (2007).

**{¶ 37}** Here, there was simply no foundation laid by a custodian of the record or by any other qualified witness. Detective Veverka was not a custodian of the records. He did not prepare or keep the phone records as part of a regularly conducted business activity. Nor was he an "other qualified witness" under the rule. A "qualified witness" for this purpose would be someone with "enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business." 5 McLaughlin, *Weinstein's Federal Evidence,* Section 803.08[8][a] (2d Ed.2009); *United States v. Lauersen*, 348 F.3d 329, 342 (2d Cir.2003). Tellingly, in the midst of discussions regarding the lack of authentication of the records, the trial judge remarked, "My gut reaction is to subpoena Verizon." That did not happen.

**{¶ 38}** In *Yeley-Davis*, both the certification authenticating Yeley-Davis's phone records and the affidavit authenticating the phone records of her two alleged co-conspirators stated that the records were kept in the course of Verizon's regularly conducted business. 632 F.3d at 677. In this case, there is no such authentication. The records in this case lacked a certification or affidavit authenticating them, and no "custodian or other qualified witness" testified that the phone records were business records.

**{¶ 39}** Thus, the cell-phone records in this case were hearsay; they were "statement[s] * * * offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). They were offered to prove that cell-phone contact had occurred between co-conspirators up to the time of the crime and immediately afterward. Since the records were not authenticated pursuant to Evid.R. 803(6), they were inadmissible as hearsay pursuant to Evid.R. 802.

**{¶ 40}** A hearsay violation itself violates the Confrontation Clause, and thus requires a heightened harmless-error analysis:

> As noted by the United States Supreme Court, hearsay violates the Confrontation Clause of the United States Constitution unless it comes within a firmly rooted exception or contains other indicia of reliability. *White v. Illinois* (1992), 502 U.S. 346, 356, 112 S.Ct. 736, 743, 116 L.Ed.2d 848, 859. Thus, any error in admitting this hearsay would be constitutional error. In order to find constitutional error harmless, this court must find beyond a reasonable doubt that the error did not contribute to the verdict. *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-711.

*State v. Johnson*, 71 Ohio St.3d 332, 339, 643 N.E.2d 1098 (1994).

{¶ 41} In *State v. Hirtzinger*, 124 Ohio App.3d 40, 49-50, 705 N.E.2d 395 (2d Dist.1997), the court faced a similar issue. In a criminal trespass case, the defendant's ex-wife testified that she had called the defendant on his cell phone when she saw his truck coming out of her driveway. She stated that he answered the call, laughed at her, and hung up. The defendant denied answering the call and denied that he was in the area. At trial, the prosecutor had the ex-wife authenticate her own cell-phone bill to demonstrate that she had made a call at the time she claimed and that the call had lasted less than a minute. The trial court allowed the admission of the cell-phone bill based upon that authentication.

{¶ 42} The appellate court held that the ex-wife could not self-authenticate the phone bill:

> This rule [Evid.R. 803(6)] requires that some person testify as to the regularity and reliability of the business activity involved in the creation of the record. In the instant case, the prosecution did not call to the stand any Ameritech employees to testify as to the nature of their billing practices. The only foundation for the evidence came through Mrs. Hirtzinger. That foundation was not adequate.

*Hirtzinger* at 49. As for the appropriate error analysis, the court held:

> When a court admits hearsay against the dictates of Evid.R. 802, the standard of review is a strict one. "In the final analysis, the evidence in favor of conviction, absent the hearsay, must be so overwhelming that the admission of those statements was harmless beyond a reasonable doubt." *State v. Kidder* (1987), 32 Ohio St.3d 279, 284, 513 N.E.2d 311, 317.

*Hirtzinger* at 50.

Harmlessness Review

{¶ 43} In determining whether admission of the cell-phone records was harmless, the court below applied the "harmless beyond a reasonable doubt" standard of review. *Hood*, 2010-Ohio-5477, at ¶ 27. "Where constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of [the] defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph six of the syllabus. The court below concluded, "Considering Hill's devastating testimony against appellant, we cannot find that the admission of the cell phone records contributed to appellant's conviction." 2010-Ohio-5477 at ¶ 30. We agree that the admission of the cell-phone records was harmless beyond a reasonable doubt.

{¶ 44} The evidence of Hood's guilt was overwhelming. We first note that jurors did not have to believe that Hood pulled the trigger to find him responsible for Peet's death; they just had to find that he participated in the criminal act that led to Peet's death. Kareem Hill was a co-conspirator and eyewitness; Hill's DNA was found at the scene. His version of events inside the house was consistent with testimony from the victims. He provided detailed testimony against Hood.

{¶ 45} Hill's testimony was, by itself, disastrous for the defense. And it was corroborated by other evidence. Hood's DNA was found in Hill's vehicle, on a cigar tip in the front ashtray; Hood could not be ruled out as a contributor to DNA found on the right and left rear interior passenger doors of Hill's vehicle. Peet could not be ruled out as a contributor of part of the mix of DNA found on the interior left rear passenger door, corroborating Hill's testimony that Hood and Peet had been together in Hill's vehicle.

16

{¶ 46} When police surrounded Hill's vehicle in the McDonald's parking lot following the robbery, Hood was inside. Also in the vehicle were cell phones stolen during the robbery, as well as cash. A large amount of cash was found in Hood's possession.

{¶ 47} What role did the cell-phone records play in Hood's conviction? Upon review, we conclude that the records were of minimal probative value and, at most, were merely cumulative in effect. Veverka testified that cell-tower logs placed Hood in the vicinity of the crime. But there were no calls to or from Hood between 2:52 a.m. and 6:24 a.m. on the morning of the crime. The break-in occurred at around 5:00 a.m., so the cell towers do not place him in the vicinity at the crucial time.

{¶ 48} In one respect, the phone records could even be seen as weakening the state's case against Hood. As the defense pointed out during its cross-examination of Hill, the records reflect calls made between Hill and Hood at times when the two men were, according to Hill, together in Hill's car. Hill had no explanation for why two people would communicate by phone when they were both inside the same car.

{¶ 49} Terrence Davis's records were also introduced. The records reveal no contact with Hood, but there is contact with Hill. This does back up Hill's testimony that conversations regarding planning occurred between someone using Hill's phone and Davis.

{¶ 50} But the key evidence—the evidence that places Hood inside the house participating in the crimes—does not depend in any way on the cell-phone records. DNA evidence proves that Hill was there, and Hill placed Hood there, armed with an Uzi, wearing latex gloves, and participating in the robberies. Victim testimony corroborated to a large extent Hill's version of events inside the house. Hood was in the vehicle containing the spoils of the robberies soon after they occurred. We thus conclude that the admission of the cell-phone records did

not contribute to Hood's conviction and that their admission was harmless beyond a reasonable doubt.

{¶ 51} We therefore affirm the judgment of the court of appeals.

Judgment affirmed.

O'CONNOR, C.J., and LUNDBERG STRATTON, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

O'DONNELL, J., dissents and would dismiss the appeal as having been improvidently accepted.

_____

William D. Mason, Cuyahoga County Prosecuting Attorney, and Kristen L. Sobieski, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Melissa M. Prendergast, Assistant Public Defender, for appellant.

Michael DeWine, Attorney General, Alexandra T. Schimmer, Solicitor General, Elisabeth A. Long, Deputy Solicitor, and Samuel Peterson, Assistant Attorney General, urging affirmance for amicus curiae, state of Ohio.

_____