[Cite as *State v. Jones*, 2026-Ohio-311.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


STATE OF OHIO,                  :

       Appellee,             :

vs.                             :

STEPHEN A. JONES,         :

       Appellant.           :

                               :

CASE NO. CA2025-05-031

<u>OPINION AND</u>
<u>JUDGMENT ENTRY</u>
2/2/2026


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 24CR41938


Connie Pillich, Special Prosecuting Attorney for Warren County, and Scott Heenan, Chief Assistant Special Prosecuting Attorney for Warren County, for appellee.

Engel & Martin, LLC, and Joshua A. Engel, for appellant.


**O P I N I O N**


**HENDRICKSON, P.J.**

{¶ 1} Appellant, Stephen A. Jones, appeals his conviction in the Warren County Court of Common Pleas for rape, unlawful sexual conduct with a minor, and two counts

of gross sexual imposition. For the reasons discussed below, we affirm.

## I. Facts and Procedural History

{¶ 2}   On August 26, 2024, the Warren County Grand Jury returned a six-count indictment charging Jones with rape, unlawful sexual conduct with a minor, sexual battery, and three counts of gross sexual imposition ("GSI"). The charges of the indictment stemmed from allegations that Jones sexually abused the victim, "Ella," on two separate occasions in 2023 when she was 15 years old.

{¶ 3}   Jones pled not guilty to the charges and the matter proceeded to a bench trial on March 6, 2025. At trial, the State presented testimony from Ella, who was 17 at the time, her mother, her older brother ("Luke"), and three law enforcement officers involved in the investigation.[1] The defense did not present any witnesses.

{¶ 4}   The testimony at trial revealed that Ella's mother is married to Scott, who is Ella's stepfather. Jones is Scott's brother and has been involved in Ella's life since she was a young child. Ella considered Jones like an uncle and maintained a good relationship with him for much of her life. In March 2023, Ella's mother and stepfather temporarily separated, and Ella moved into a motel with her mother and Luke. At the motel, the family lived in a single room furnished with two queen-sized beds and a chair that pulled out into a bed. Typically, Ella slept on one of the beds, her mother slept on the other, and Luke slept on the pull-out bed.

{¶ 5}   Around the time Ella's family moved into the motel, Ella's mother began an extramarital affair with Jones. The children were aware of their mother's affair and often heard their mother and Jones engaging in sexual activity in the motel room's bathroom.

---

1. Ella and Luke are pseudonyms adopted for this opinion to protect the privacy of the minor victim and her family. *State v. Cansler*, 2025-Ohio-2558, ¶ 3, fn. 1 (12th Dist.).

Ella testified that her mother's relationship with Jones made Ella angry and prompted her to change Jones' name in her cell phone to "Uncle Slut."

{¶ 6}   When Ella's mother and Jones became romantically involved, Jones visited the motel often. When visiting, Jones brought various types of alcohol to share with the family and slept in the bed with Ella's mother. One evening, Jones arrived at the motel with a bottle of liquor, a pack of Twisted Tea, and additional alcohol for himself.[2] Throughout the evening Ella, her mother, and Jones drank the alcohol while Luke smoked marijuana and played video games. By the end of the night, Jones and Ella's mother finished the bottle of liquor and drank some of the Twisted Tea, while Ella drank a few shots of liquor and a few sips of the Twisted Tea. Ella described herself as buzzed while her mother and Jones were described as drunk. At some point, Ella's mother passed out in her bed and Luke passed out on Ella's bed.

{¶ 7}   Ella testified that, after her mother and Luke fell asleep, Jones began text messaging her to join him in the bathroom. At that time, Ella was lying on her bed next to her brother and repeatedly responded "no" to Jones' messages. According to Ella, she "kind of knew where he . . . was heading with this," although, she denied he had messaged her like this before. At some point, Jones exited the bathroom and approached Ella in her bed. Ella testified Jones then leaned over her and placed one of his hands in her shirt, beneath her bra, and squeezed her breasts. Jones proceeded to move his hand into Ella's shorts, under her underwear, and put his fingers in her vagina. According to Ella, while Jones' fingers were in her vagina, Jones told her, "If you let me do this, I'll buy you anything." Jones then turned Ella's head and forced her to kiss him. During this encounter, which Ella testified lasted 20 minutes, Ella could feel Jones' erect penis through his

---

2. Ella could not recall the exact date of the incident but testified it occurred in late March 2023.

clothes and against her back. Ella "froze" and could not alert anyone to Jones' actions during that time. Eventually, Jones left Ella's bed and went to sleep next to her mother.

{¶ 8} The following morning, Ella privately disclosed the incident to her mother. In so doing, Ella told her mom that "something might have happened last night," that "[Jones] fingered [her]" and that she "thought [Jones] was touching [her], but it might have been a dream." According to Ella, she was "trying to manipulate [herself] into thinking like it didn't happen and [she] was really wishing that it was a dream." At the time of trial, however, she was sure that Jones had assaulted her that evening.

{¶ 9} After Ella's disclosure, her mother responded that Ella had "to be positive" because "this ha[d] happened before," with a different brother of Scott's.[3] Ella's mother testified that she did not consider Ella's disclosure "legitimate enough" to involve the police at that time. In light of her mother's response, Ella "left it alone" because she felt it was her fault she was assaulted by a second member of her stepfather's family and did not want to "ruin [his] family anymore."

{¶ 10} Approximately one week after the incident at the motel, Ella's mother reunited with Scott and the family moved into Scott's mother's home. Scott's brothers, Jones and Brian, also lived with his mother at that time, although Brian left shortly thereafter. Ella testified that her mother and Scott slept in one bedroom, Luke slept on the couch in the living room, and she slept in Jones' bed. Ella explained that she was comfortable with this arrangement because Jones worked night shift, meaning his room was empty during the evenings, and she could lock the door while she slept.

{¶ 11} One evening, Ella was lying in Jones' bed when he returned home early from work. Jones used a credit card to gain access to his room and told Ella to stop

---

3. There was evidence presented that when Ella was five years old, her stepfather's second brother, Brian, pled guilty to a sex offense involving Ella.

locking the door. At that point, Jones came to the bed and "kept forcing [Ella] to kiss him." Jones then put his hands in her shirt, under her bra, and groped her breast. At that point, Ella pushed Jones away and went downstairs. Ella did not tell anyone what happened that evening.

{¶ 12} After the incident in Jones' bedroom, Ella's behavior and overall health began to deteriorate. She lost significant weight, experienced a lot of anger and anxiety, and began vomiting, passing out, and having seizures. According to Ella, the seizures were triggered by discussions of Jones or the court case and happened almost daily at the time of trial.

{¶ 13} In June or July 2023, Ella's family moved out of Scott's mother's home. Approximately six months later, in January 2024, Ella disclosed the abuse to her mother. Ella testified that, at that time, she had been thinking about the incidents more often and "practically [had] a panic attack" the day she disclosed the abuse to her mother. During this disclosure, Ella explained that "it wasn't a dream," which her mother considered to mean that Ella's earlier disclosure at the motel was true, and that she was sorry. The following day, Ella, her mother, and Luke went to the police department to report the assaults. Ella underwent a forensic interview, during which she discussed the two incidents described above, and an investigation into her allegations ensued.

{¶ 14} Detective Sechrist testified that he led the investigation in the case. As part of that investigation, the detective executed a search warrant for Jones' cell phone. After obtaining Jones' cell phone, a detective downloaded its contents using a program called Cellebrite, which extracted the data from Jones' phone and created an image of his phone for forensic review. Detective Sechrist also issued a subpoena to AT&T for Ella's cell phone records, which were obtained and admitted as an exhibit at trial. The records provided by AT&T do not include any content of text messages sent or received by Ella

but did provide information regarding each message, including the date and time of each message, as well as the phone numbers associated with the message's sender and recipient.

{¶ 15} Detective Sechrist later provided the cell phone records obtained from AT&T and Jones' cell phone to Detective Behymer for her review. After her review of the relevant records, Detective Behymer created a report summarizing her comparison of Ella's phone records and the call and text logs extracted from Jones' phone. Detective Behymer's report was admitted at trial, and reveals, in part, that Jones and Ella exchanged 443 text messages between March 8, 2023 and April 20, 2023, and that the pair made calls to one another during that time. After comparing Ella's cell phone records with the data from Jones' phone, Detective Behymer discovered that a significant number of messages were missing from Jones' phone, including all messages he exchanged with Ella between March 7, 2023 and March 26, 2023. Detective Behymer concluded that the messages between Jones and Ella during that time had been manually deleted from Jones' phone. The detective further testified that, in total, more than 10,000 "scattered" messages, i.e., text messages from various dates and times, had been manually deleted from Jones' cell phone. The detective indicated she could not determine if all the deleted messages were sent between Ella and Jones and acknowledged they could have included messages to Ella's mother.

{¶ 16} At the conclusion of Detective Behymer's testimony, the State rested its case-in-chief. The defense moved for an acquittal on Counts 5 and 6 pursuant to Crim.R. 29, which the trial court denied. The defense then rested without presenting any witnesses and the parties presented their closing arguments.

{¶ 17} After considering the evidence presented at trial, the trial court issued its decision from the bench finding Jones guilty of rape, unlawful sexual conduct with a minor,

and two counts of gross sexual imposition. The trial court found Jones not guilty of the remaining charges of the indictment. In so finding, the trial court noted that its decision came down to the credibility of Ella and stated that, if it believed Ella, then Jones was guilty. In rendering its decision, the court specifically stated that "the question is whether or not [Ella's] testimony basically standing alone is sufficient for [the court] to be firmly convinced of the truth of those charges. And . . . it is. I do believe [Ella] in this case. I believe that the sum and the substance of the allegations are true as she relayed them to me."

{¶ 18} The trial court then ordered a presentence investigation and set the matter for sentencing. After a hearing, the court sentenced Jones to an aggregate indefinite prison term of eight to ten and one-half years.

## II. The Appeal

{¶ 19} Jones now appeals, raising the following assignment of error for our review:

{¶ 20} THE TRIAL COURT IMPROPERLY ADMITTED CELL PHONE RECORDS IN VIOLATION OF EVIDENCE RULE 803(6) AND DEFENDANT'S CONFRONTATION RIGHTS.

{¶ 21} On appeal, Jones argues the trial court committed prejudicial error by admitting evidence that was derived from Ella's cell phone records, which he argues were not properly authenticated as business records under Evid.R. 803(6). Jones contends the improper admission of these records violated his rights under the Confrontation Clause. After our review of the entire record, and assuming, arguendo, that Ella's cell phone records were hearsay evidence, we find that any error in the admission of those records was harmless beyond a reasonable doubt.

### A. Relevant Law

{¶ 22} "Generally, a trial court's ruling as to the admissibility of evidence will not be

reversed absent an abuse of discretion." *State v. Leach*, 2024-Ohio-3145, ¶ 12 (12th Dist.), citing *State v. Knecht*, 2015-Ohio-4316, ¶ 20 (12th Dist.). However, a claim that a criminal defendant's rights have been violated under the Confrontation Clause is reviewed de novo. *Id*.

{¶ 23} The Confrontation Clause, as found in the Sixth Amendment to the United States Constitution, preserves the right of a criminal defendant "to be confronted with the witnesses against him." To that end, the Confrontation Clause bars the admission of "testimonial hearsay" unless the declarant is unavailable and the accused had a prior opportunity to cross-examine the declarant. *State v. Primo*, 2005-Ohio-3903, ¶ 12 (12th Dist.), citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The key issue, therefore, is what constitutes a testimonial statement for "'[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.'" *State v. Hood*, 2012-Ohio-6208, ¶ 33, quoting *Davis v. Washington*, 547 U.S. 813, 821 (2006).

{¶ 24} In this case, the State argued at trial that Ella's cell phone records were admissible as an "ordinary business record." Business records are typically considered to be nontestimonial because "'they are prepared in the ordinary course of regularly conducted business and are "by their nature" not prepared for litigation.'" *Id*. at ¶ 34, quoting *State v. Craig*, 2006-Ohio-4571, ¶ 82. Business records are "generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). Thus, "[w]hether a business record meets a hearsay exception is immaterial in regard to the Confrontation Clause; it is the nontestimonial character of the record that removes it from the purview of the

Confrontation Clause." *Hood* at ¶ 34.

{¶ 25} Cell phone records usually qualify as business records because "[e]ven when cell phone companies, in response to a subpoena, prepare types of records that are not normally prepared for their customers, those records still contain information that cell phone companies keep in the ordinary course of their business." *Hood* at ¶ 36. Accordingly, the Confrontation Clause does not normally affect the admissibility of cell phone records. *Id*. at ¶ 39. Nonetheless, unless it is established that a cell phone record is, in fact, a business record, the Confrontation Clause can operate to bar admission of the record. *Id*. at ¶ 42.

{¶ 26} Evid.R. 803(6) governs the admissibility of business records. To qualify for admission pursuant to Rule 803(6),

> a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.'

*State v. Davis*, 2008-Ohio-2, ¶ 171, quoting Weissenberger, *Ohio Evidence Treatise*, Section 803.73, 600 (2007).

{¶ 27} Before a business record is admitted pursuant to Evid.R. 803(6), the record must be properly identified or authenticated. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by introducing "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A); *State v. Moshos*, 2010-Ohio-735, ¶ 11 (12th Dist.). This threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity. *State v. Jackson*, 2011-Ohio-5593, ¶ 15 (12th Dist.).

- 9 -

{¶ 28} In order to properly authenticate business records, a witness, such as an employee of the company, must "testify as to the regularity and reliability of the business activity involved in the creation of the record." *State v. Thomas*, 2012-Ohio-2430, ¶ 19 (12th Dist.). While firsthand knowledge of the business transaction is not required by the witness providing the foundation, the witness must demonstrate that he is familiar with the operation of the business and the "circumstances of the record's preparation, maintenance and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Evid.R. 803(6)." *State v. Glenn*, 2009-Ohio-6549, ¶ 19 (12th Dist.).

{¶ 29} Without a certification or affidavit authenticating cell phone records as business records or testimony from a "custodian or other qualified witness" identifying the cell phone records as authentic business records, it cannot be determined whether the cell phone records are nontestimonial. *Hood*, 2012-Ohio-6208, at ¶ 41-42. Under such circumstances, admission of the cell phone records is constitutional error. *Id*. at ¶ 42; *State v. Sutton*, 2022-Ohio-2452, ¶ 42-45 (3d Dist.).

### B. Authentication of Ella's Cell Phone Records

{¶ 30} In this case, the cell phone records obtained for Ella's cell phone were entered into evidence as State's Exhibit 4. They were also discussed during Detective Behymer's testimony and used in preparation of State's Exhibit 5, the detective's summary report analyzing Ella's cell phone records and Jones' cell phone data.

{¶ 31} In an attempt to authenticate the cell phone records, the State relied upon testimony from Detective Sechrist, who explained that he obtained the cell phone records for Ella's cell phone by submitting a subpoena to AT&T, Ella's cellular service provider, who delivered the relevant records electronically to Detective Sechrist via a secure online

portal. The records within Exhibit 4 do not include a cover sheet or any other identifying information certifying the records are true and accurate records from AT&T.[4] After receiving the records from the portal, Detective Sechrist provided the records to Detective Behymer for forensic review.

{¶ 32} On appeal, Jones argues Detective Sechrist's testimony was insufficient to authenticate the cell phone records as a business record. In support, Jones relies upon *State v. Hood*, 2012-Ohio-6208. In that case, the Ohio Supreme Court considered whether a detective's testimony properly authenticated certain cell phone records that were admitted at trial. *Hood* at ¶ 39-42. At trial, the detective testified that the cell phone records were obtained by subpoenaing cellular-phone companies, which yielded records that contained information like the calls made or received from the relevant cellphone, the number making the call, the number receiving the call, and the date and duration of the call. *Id*. at ¶ 17-18, 20, 36. The State elicited testimony from various law enforcement officers regarding the records, including the call logs and cellular-tower records for the days at issue, to show that the defendant made calls at certain times while located in a certain area. *Id*. at ¶ 19. Upon review, the Ohio Supreme Court held that the detective's testimony did not sufficiently authenticate the records as a business record, and therefore, the admission of those records violated the defendant's rights pursuant to the Confrontation Clause. *Id*. at ¶ 40-42.

{¶ 33} After our review, we find the court's holding in *Hood* applicable to this case. Like the detective in *Hood*, Detective Sechrist stated he received the cell phone records directly from AT&T via an issued subpoena; however, neither he nor Detective Behymer

---

4. The only identifying information of the cell phone records is the AT&T logo and statements that "AT&T has queried records from 03/01/2023 . . . to 04/20/2023[;]" that the records are "AT&T Proprietary[;]" and that the information contained in the records is "for use by authorized persons only and is not for general distribution."

were a custodian of the cell phone records or an "other qualified witness" as that term is used in Evid.R. 803(6). *See Hood* at ¶ 40; *State v. Stevens*, 2023-Ohio-3280, ¶ 83 (4th Dist.); *Sutton*, 2022-Ohio-2452, at ¶ 46. Furthermore, like in *Hood*, the record in this case contains no certification or affidavit authenticating the cell phone records as business records, and no representatives from AT&T were subpoenaed to testify at trial, despite being identified as a potential witness in the State's discovery responses. Thus, the State did not authenticate the cell phone records as business records, making it impossible to determine whether the records are nontestimonial. Consequently, because it is not possible to determine whether the cell phone records are nontestimonial, to the extent those records are hearsay evidence, the trial court erred by admitting them without sufficient authentication. *Id*. at ¶ 41.

### C. Harmless Error

{¶ 34} Notwithstanding the above, even if the cell phone records were improperly authenticated and the trial court erred in admitting the contents of Exhibit 4, we conclude that any error in that regard was harmless beyond a reasonable doubt. In cases where the defendant has established a violation of rights under the Confrontation Clause, the Supreme Court of Ohio has consistently applied a harmless-error analysis to determine whether the issue prejudiced the defendant. *See State v. McKelton*, 2016-Ohio-5735, ¶ 192; *State v. Carter*, 2024-Ohio-1247, ¶ 46; *Hood* at ¶ 50; *see also Primo*, 2005-Ohio-3903, at ¶ 17 ("violations of the Confrontation Clause are subject to a harmless-error review"). In so doing, the court has acknowledged that, "[w]here constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of [the] defendant's guilt." *Hood* at ¶ 42, citing *State v. Williams*, 6 Ohio St.3d 281 (1983), paragraph six of the syllabus.

{¶ 35} On appeal, Jones argues the trial court's error was not harmless because the remaining evidence against Jones was not strong and "there were questions regarding the credibility [of] the alleged victim." After our review, we disagree. While we acknowledge that the victim's testimony was somewhat corroborated by the production of Ella's cell phone records, even with this evidence removed from the equation, we are not persuaded that the outcome of Jones' trial would have been different. While our analysis might be different had this case been tried to a jury, the record in this case clearly reveals that the trial court rested its judgment not on Ella's cell phone records, but on the credibility of her testimony.[5] Such testimony, if believed, provides overwhelming evidence that Jones is guilty of rape, unlawful sexual conduct with a minor, and two counts of gross sexual imposition. The trial court specifically noted, on the record, that it believed Ella's testimony and that the events occurred as she relayed them at trial.[6] As such, we conclude that any error in the trial court's decision to admit Ella's cell phone records was harmless beyond a reasonable doubt. *See State v. Lawson*, 2020-Ohio-3004, ¶ 26 (10th Dist.).

{¶ 36} Judgment affirmed.


PIPER and SIEBERT, JJ., concur.

---

5. We are also unpersuaded by Jones' reliance on *State v. Ferricci*, 2022-Ohio-1393, ¶ 89 (8th Dist.) and *State v. Burrell*, 89 Ohio App.3d 737, 746 (9th Dist. 1993) for the proposition that an error is not harmless if the "case is a credibility contest between the victim and the defendant and no independent evidence exists." Neither of the cases cited by Jones involved bench trials and both are factually distinguishable from the instant matter. In this case, Ella's testimony of what occurred before and after the assaults was consistent with testimony from her mother and Luke.

6. The trial court also stated that the phone data was "not really inconsistent with [Ella's] testimony or her version of the events. Doesn't necessarily prove the State's case either."

# J U D G M E N T   E N T R Y

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Melena S. Siebert, Judge