[Cite as *State v. Frazier*, 2015-Ohio-3116.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-140369 |
| | | TRIAL NO. B-1208535 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| BYRON FRAZIER, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed and Cause Remanded

Date of Judgment Entry on Appeal: August 5, 2015

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Rachel Lipman Curran*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, *Christine Y. Jones*, *David Hoffman* and *Josh Thompson*, Assistant Public Defenders, for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

**MOCK, Judge.**

{¶1}    Defendant-appellant Byron Frazier was charged with the aggravated murder, murder, and felonious assault of Kyila Shields, the attempted murder and felonious assault of Adam Deters, and the attempted murder and felonious assault of their two-month-old son, Adam Deters, Jr., ("AJ") in connection with shootings on Christmas Day in 2012. Each of the charges was accompanied by firearm specifications.

{¶2}    The charges were tried to a jury. At the close of the state's case-in-chief, the trial court granted Frazier's Crim.R. 29 motion for an acquittal on the attempted-murder and felonious-assault charges regarding AJ. The remaining charges were submitted to the jury. The jury found Frazier not guilty of the aggravated murder of Kyila, but guilty of the remaining charges and firearm specifications.

{¶3}    At sentencing, the trial court merged the felonious assault and murder of Kyila. It also merged the felonious assault and attempted murder of Deters, and it merged the firearm specifications with respect to each of the victims. It sentenced Frazier to 15 years to life for the murder of Kyila, and to three years for the accompanying firearm specifications, to 11 years for the attempted murder of Deters, and to three years on the merged firearm specifications relating to Deters. The trial court ordered that the terms be served consecutively, for a total sentence of 32 years to life in prison. Frazier now appeals.

{¶4}    In this appeal, Frazier challenges the weight and sufficiency of the evidence adduced to support his convictions, the trial court's admission of evidence, the trial court's failure to grant a mistrial due to prosecutorial misconduct during closing argument, the trial court's complicity instruction, the trial court's failure to journalize a judgment entry discharging the jury following the first mistrial, and the trial court's failure to enter its sentencing findings on the judgment entry. He also alleges that cumulative error deprived him of a fair trial. Because the trial court failed to include the

consecutive-sentence findings in the judgment entry, we remand the cause to the trial court to issue a nunc pro tunc entry. We affirm the trial court's judgment in all other respects.

### *A Family Feud Turns Deadly*

{¶5} The following evidence was presented at Frazier's trial. Adam Deters testified that on December 25, 2012, he, his fiancée Kyila Shields, AJ, and Adam's daughter, Jada, traveled to the home of Linda Shields, Kyila's maternal grandmother. Adam and Kyila had been dating two years. Adam knew Kyila's mother, Regina Shields, almost as long as he had known Kyila. He met Regina's boyfriend, Byron Germany, in 2011 when Germany had been released from prison. Frazier is Germany's son. Adam had known Frazier for as long as he had known Germany. The two men had met multiple times, and Frazier had even attended Adam's 25th birthday party.

{¶6} Everyone got along well until a disagreement arose about a house that Kyila and Adam had rented from Regina and Germany in the summer of 2012. Before leaving, Adam and Kyila had caused significant damage to the rental home. This angered Germany. Adam and Kyila refused to speak with Regina or Germany about the matter. Frazier, however, inserted himself into the family dispute, arguing with both Adam and Kyila on the phone about the damage. Frazier repeatedly told Adam to "meet me and we can fight." He also threatened to shoot Adam.

{¶7} Shortly after arriving at Linda's home on Christmas Day, Adam left. Kyila, who had stayed behind, became visibly upset when her mother arrived with Frazier and Germany. Kyila yelled that Germany and Frazier had to leave. Frazier threatened in response, "I'm having a very bad day; you don't want to fuck with me." Frazier was only in the house for a few minutes before leaving. Germany, however, stayed and began arguing with Kyila. Germany threatened Kyila, saying, "I ain't going to get you. I'm going to get your man."

{¶8}     When Adam returned, Kyila and Regina were arguing. Adam went to the back room where Germany approached him. They began arguing about the rental house.   At some point later, Germany threatened, "I'm going to take care of all you motherfuckers tonight, the both of you tonight."   Eventually, Linda had Germany escorted out of her home.

{¶9}     Before Kyila and Adam left, Kyila told everyone that they were going to the home of her paternal grandmother, Doris Lawrence. When Adam and Kyila arrived at Lawrence's home, it was dark outside. They parked Kyila's car on the right side of the street facing the turnaround. Adam testified that he, Kyila, and Jada stood at the back of the car unloading presents, while AJ remained in his car seat. A black SUV drove by very slowly. The SUV's windows were so darkly tinted that Adam could not see inside it, and no one else was outside. The SUV drove to the end of the street, and turned around. Adam testified that he felt uneasy, so he told Jada to go inside Lawrence's home. Kyila, however, was confrontational, asking, "What the fuck is this? Who's this?"

{¶10}     The black SUV then drove back past Kyila's car before parking 20 feet away. Adam testified that Frazier and another man jumped out of the SUV. Frazier exited from the back passenger door on the driver's side of the SUV with a two-feet-long, black gun in his hand, and started walking toward them. He told Adam and Kyila, "This is what you get." Kyila told Adam to leave.   Adam jumped into Kyila's car and drove away. As soon as he got in the vehicle, Frazier and the other man fired at least ten shots at Kyila's car. Adam was shot in the top of his head. He was later treated with eight staples.

{¶11}     Adam testified that Kyila had remained standing behind the car. Adam drove Kyila's car to the end of the cul-de-sac and stopped there, waiting. When he looked back, no one was there. The black SUV had gone. As Adam came back, he found Kyila's purse in the middle of the street, and thought that she had been abducted. He

4

ran with AJ into Lawrence's home. Panicked, he asked if Kyila had come inside. Lawrence called 911. Because Adam thought Bryron Frazier was named Byron Germany, Jr., he indicated that to the police. He said the shooter was 26 years old, and the vehicle involved was a black Honda SUV. As he was going into unconsciousness, Adam said Frazier took Kyila. He told how Frazier had "said that he was going to kill us."

{¶12} Belinda Griffin, Kyila's great aunt, had answered the door when Jada knocked. Griffin testified that from the porch, she had seen three people dressed in black hoodies and one person in white clothing down the street. Kyila, who was wearing a white shirt, was arguing with them, and they pushed and shoved her to the ground. Griffin saw Kyila get up and run toward the back of her car, which had been facing the street, when someone grabbed her from behind and dragged her towards a black SUV. According to Griffin, the black SUV had been facing the dead end of the street. Griffin then heard at least ten shots being fired at Kyila's car. She ran into the house. Five or ten minutes later, Adam came into the house with AJ. Griffin testified that Adam was hysterical. He was crying and covered in blood. Adam said that Kyila had been kidnapped, and he kept talking about "Little B," which was Frazier's nickname.

### Police Investigation

{¶13} Cincinnati Bell records showed that someone had sent Frazier a text message at 7:40 p.m. and 7:42 p.m. Christmas night. At that time, Frazier's phone utilized the two cell phone towers closest to Lawrence's home to receive the messages. Roughly three hours later, Frazier had sent a text message saying, "Nothin I took care of it." When police apprehended Frazier at his grandmother's home the following morning, they found a single knit glove in his pocket and he was wearing a dark-colored shirt. Both items were tested for gun-shot residue. The glove had five particles of gun-shot residue and the shirt had 11 particles of gun-shot residue. Police also found a cell

phone in the same room where they arrested Frazier. Frazier had a hooded black mink coat. After executing a search warrant on Frazier's residence, police found no weapons, but they did find three empty Glock firearm boxes, two magazines to hold bullets, three test-fire bullets, and a shoulder holster. They also found another cell phone belonging to Frazier. The police obtained a search warrant to look in Frazier's cell phones.

{¶14} Police, who had responded to the scene of the shooting, found several shell casings in the middle of the street. Eventually, they found Kyila's lifeless body lying in the grass. An autopsy revealed that Kyila had been shot four times, three times in the back and once in the right buttock. The deputy coroner testified that Kyila had died from internal bleeding due to the gunshot wounds.

{¶15} Criminalists Denise Burns and Don Werling processed the scene. Burns photographed the scene. She testified that it was dark, but that porch lights on the house were lit. Some artificial light was obvious in the photographs. Burns testified she could see Werling's facial features and clothing without a flashlight, even when he was more than 20 feet away. She further testified that there was one street light on the street where the shooting had occurred, as well as lights on the houses lining the street. Burns and Werling created a diagram of the scene highlighting the evidence that had been recovered. A laser scanner was used to measure the distance between different objects and to ensure the diagram was made to scale.

{¶16} On cross-examination, Burns admitted that prior to her testimony she had discussed with the prosecutor that she had seen Werling's face from at least 20 feet away as she processed the scene the night of the shootings. She admitted that since it was dark outside at the time they processed the crime scene, artificial lighting had been used in some of the photographs and they did not depict how someone would naturally see the scene.

{**¶17**}  Werling also admitted that it was very dark while they were processing the scene.  He testified that multiple vehicles in the area had been damaged by the gunshots and that Kylie's car had sustained significant damage.   The passenger side mirror was broken.  Three indentations showed where bullets had hit the driver's door.  The rear driver's side window was broken, and the sun screen covering it from the inside was ripped.  A bullet had damaged the rearview mirror inside the car and the center console located above it.  The windshield was damaged, too.  Werling found copper jacketing from a bullet on the rear right-side passenger seat.  The lead core of a bullet was found in the floorboard area of the driver's door.

{**¶18**}  The criminalists testified that they recovered two different brands of 9 mm shell casings at the scene.  A total of 17 casings were examined.  No fingerprints or DNA was found on the casings.  After evaluating the autopsy bullet and pieces of other bullets, Kevin Lattyak, a firearm examiner, determined that two different guns had been used; one gun had fired two of the casings and another gun had fired 15 of the casings.  The 9 mm casings recovered from Frazier's apartment did not match those at the scene.   One of the boxes of ammunition recovered from Frazier's apartment contained cartridges that were consistent with a Hi-Point firearm.  Lattyak testified that a shorter rifle, such as a carbine, could fire 9 mm cartridges.  A carbine would be about two feet long.

### *Regina's Testimony*

{**¶19**}  Regina testified at trial before she was to serve a sentence in the federal penitentiary for tax fraud. She had gone to prison for committing robbery while Kyila was a child.  During that time, Kyila had lived with Linda Shields, Kyila's father, and Lawrence.  Regina testified that she had been in a relationship with Germany for 13 years, and was still living with him at the time of trial.  They had a nine-year-old daughter.  Regina testified that she had known Frazier for years, since he was 18 or 19

years old, and that he and Germany were very close. Anytime Germany asked Frazier to do something, he did it.

{¶20} Regina's description of the Christmas party at Linda's house was similar to Linda Shields's and Adam's descriptions. She acknowledged that Kyila and Frazier had a very heated argument. Frazier was so upset when he was being forced out of the house that he said, "I ain't got to do shit to you. I'll fuck your man up, bitch ass white boy." Frazier continued, "I'll mirk (kill) that bitch ass white boy. I'll do it tonight. Yeah, I'll do it tonight. You know, go on out the door." Regina testified that Germany had then left with Frazier after this initial confrontation. When Germany came back inside a half hour later, she was arguing with Kyila.

{¶21} According to Regina, Kyila and Germany had started arguing when Kyila learned that Germany had said something to Adam. Regina heard Germany tell Kyila, "I ain't got to do nothing to you. If I want to do something, I'll get your man." Regina testified that Germany told their nine-year-old daughter that she could not go with Kyila when she left the house. Regina testified that she had seen Frazier, who had driven separately to the party, standing outside his car, which had been parked up the street from Linda's house. She also saw him walking up the street to a carwash. Regina testified that Lawrence lived less than five minutes away. Germany and Frazier both knew the address. When Regina later left Linda's house with Germany, she warned him that she would tell on him if he did anything to Kyila or Adam.

{¶22} Upon learning that Adam had been shot, Regina immediately suspected Frazier's involvement. When she returned to Linda's house and heard that Kyila had been killed, Regina gave the police Frazier's name, his phone number, and the addresses where he stayed. Regina knew Frazier carried guns, including a sawed-off shotgun that was about two feet long. She said the firearm looked like a rifle without a long neck. Regina denied that she had been upset with Kyila and Adam for damaging the rental

property, and testified that when Kyila and Adam had left the Christmas party at Linda's home, she had promised them things would be better.

### Bryant's Testimony

{¶23}   Michael Bryant testified that he had known Frazier and Germany for years.  Bryant and Germany had been in a "business relationship" since 2006.  Bryant testified that Frazier was part of the business.  Bryant acknowledged that he had a horrible criminal record, and that he expected some leniency in regard to his own criminal charges in exchange for testifying against Frazier. But he admitted that the prosecutors and police had not made any promises to him.  Bryant stated his testimony was truthful.

{¶24}   Bryant testified that shortly after Christmas 2012, he was incarcerated in the Hamilton County Justice Center with Frazier.  On Christmas night, Frazier had called him and had said "his daddy gave him permission to handle that."  Frazier said he had "taken care of" Adam.  Frazier told Bryant how he had watched as Adam and Kyila were leaving Linda's home and then followed them around the corner, where he had shot them.

{¶25}   According to Bryant, Frazier said that Germany had suggested that Frazier do it because Adam owed Germany money for some property.  Adam was the target of the "hit."  When Bryant had spoken with Frazier, Frazier had thought that he had killed Adam because he had shot Adam in the head.  Bryant met with police in February 2013, and told them that Frazier had said Kyila had been shot six times in the stomach.  Bryant further testified that Frazier's nickname was "Little B."

{¶26}   On cross-examination, Bryant admitted that he had been convicted of receiving stolen property, trafficking in cocaine, and falsification, and that he was out on bail even though he was currently facing charges for aggravated burglary, aggravated robbery, robbery, and felonious assault.

9

### Defense Testimony

{¶27} Frazier testified in his defense and also presented testimony from Officer Jeff Zucker. Officer Zucker testified that he was one of the first officers to arrive at the scene of the shooting. He stated that when he entered Lawrence's home, Deters was bleeding and upset. Although he did not question Deters directly, he heard Deters say that Kyila had been kidnapped by her ex-boyfriend.

{¶28} Frazier testified that he went to Linda Shields's home on Christmas Day. He drove separately from his father, Regina Shields, and their daughter. He acknowledged that he had previously called Kyila for his father about the damage to the house, and that these phone calls had caused "bad blood" between them. When he entered Linda's home on Christmas Day, he stayed near the front door. Kyila had approached him. She was angry and confrontational, and asked him why he was there. He told her, "Today is not the day to 'F' with me. It's Christmas and I'm having a bad day already." Frazier testified that he left shortly thereafter.

{¶29} He waited outside in his car for five minutes. At that point, his father came outside and he drove them to his grandmother's home in Bond Hill. They stayed for 30 minutes, and then left to go to his other grandmother's home. As they neared her home in Forest Park, his father called Linda Shields, who informed him that Kyila and Regina were arguing in the bathroom. Germany told Frazier to turn around and take him back to Linda's house.

{¶30} Frazier took Germany back to Linda's house around 6:20 or 6:30 p.m. Frazier pulled his car up to the curb, let Germany out, and immediately headed back to his grandmother's home in Forest Park. He left shortly thereafter to pick up his mom and take her home. When he called his mother to let her know he was coming, she changed her mind and decided to stay at the party.

{¶31} Frazier decided to go home. On the way there, he stopped at a gas station. When he got home, he went to the restroom. He set a few movies to record on his DVR and then left to go back to his grandmother's home in Forest Park. On his way there, he realized he had forgotten to set his security alarm, so he returned home to set it. After setting his alarm, he went to his grandmother's home in Forest Park. He fell asleep watching television. He was awakened by the police, who had come to arrest him as a suspect in the shooting death of Kyila.

{¶32} On cross-examination, Frazier testified that if Germany asked him to help him, he would. He testified, however, that Germany had said he would kill Adam. Frazier claimed that he was not a violent person, but admitted that he owned three firearms. Frazier also admitted that he knew Kyila drove a white SUV. Frazier acknowledged he had sent a text message earlier on Christmas Day to Michael Bryant, saying "K, you got everything you need." Bryant had responded, "Need car." Bryant then texted, "Hold on. Let me get my guys on deck." Frazier and Bryant also talked on the phone twice after the shooting. But Frazier denied telling Bryant that he had shot Kyila or Adam. Frazier stated that no one had called to tell him that Kyila had been killed and that he had learned of her death by watching the news.

### Weight and Sufficiency of the Evidence

{¶33} In his first assignment of error, Frazier challenges the sufficiency and weight of the evidence adduced to support his convictions.

{¶34} In reviewing a challenge to the sufficiency of the evidence, this court must determine whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In addressing a manifest-weight-of-the-evidence challenge, this court must review the entire record, weigh the evidence and all reasonable inferences,

consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *Id.* at 387.

{¶35} The state presented sufficient evidence to support Frazier's convictions. Linda and Regina testified that Kyila and Frazier had a heated argument at a Christmas party at Linda's home. Frazier was asked to leave. Before leaving, he threatened to kill Adam. Regina testified that Frazier had initially left the area, but then returned, and was outside near Linda's house at the time that Adam and Kyila had left.

{¶36} Adam and Kyila then drove to Lawrence's home. While Adam and Kyila were unloading Christmas packages from the back of their car, a black SUV with tinted windows drove down the street and turned around. Adam testified that it drove past them again slowly, and then stopped behind their vehicle. Frazier jumped out of the black SUV with a gun, along with another man. Adam, felt uneasy and jumped into the car, while Kyila stood behind it. As Adam drove away, Frazier began shooting at Kyila and him.

{¶37} Adam was shot in the head, but managed to escape to Lawrence's home. Once Adam was inside, Lawrence called for emergency assistance, reporting that Adam had been shot and that Kyila was believed to have been abducted by the men in the SUV. During the 911 call, Adam can be heard saying that Byron Germany, Jr., and "Little B" had shot him.

{¶38} The police officers who had arrived on the scene found shell casings in the middle of the street, and damage to the driver's side of Kyila's vehicle consistent with Adam's version of events. They located Adam inside Lawrence's home and rendered medical treatment to him. Adam was transported to the hospital where he received eight staples in his head.

{¶39} During their search of the scene, police found Kyila lying dead on the side of the street. Criminalists testified that 17 9 mm shell casings had been recovered. Lattyak, the firearms examiner, testified that two different guns had been used and that one gun had fired two of the casings and another gun had fired 15 of the casings. The deputy coroner testified that Kyila had been shot four times and that she had died from internal bleeding due to the gunshot wounds.

{¶40} The following day, when Frazier was arrested, gunshot residue was found on a glove in his pocket and on his shirt. Frazier's cell phone records placed him in the vicinity of the shootings at the time they had occurred. Moreover, Bryant testified that Frazier had called him the night of the murder to say that he had shot Deters and that Kyila had also been shot multiple times. When viewed in the light most favorable to the prosecution, this evidence, if believed, was sufficient for the jury to conclude that Frazier, with the use of a firearm, had committed the felonious assault and murder of Kyila and the felonious assault and attempted murder of Adam.

{¶41} Moreover, the jury, as the trier of fact, was in the best position to judge the credibility of the witnesses. During cross-examination, defense counsel highlighted the inconsistencies in the testimony of the state's witnesses and argued the limits of the physical evidence against Frazier. And while Frazier testified that he had left the party to go his grandmother's home, and that he had then driven home, where he had been at the time of shooting, maintaining that his father had committed the offenses, the jury was free to reject his version of the events. *See State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Based upon our review of the record, we cannot conclude that the inconsistencies in the testimony of the state's witnesses rendered their testimony so unreliable or unworthy of belief that the jury lost its way and created a manifest miscarriage of justice in finding Frazier guilty of

the offenses. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We, therefore, overrule the first assignment of error.

### Admission of Evidence from Frazier's Apartment

{¶42} In his second assignment of error, Frazier argues that the trial court erred in admitting three empty carrying cases for Glock handguns, two empty magazines, a gun holster, three test-fire bullets, which police had recovered during a search of his apartment, and photographs of those items. Frazier argues that this evidence was irrelevant and prejudicial, and therefore, was inadmissible pursuant to Evid.R. 401, 402, 403 and 404.

{¶43} Generally, all relevant evidence is admissible. Evid.R. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Even though evidence might be relevant, it must be excluded if "its probative value is substantially outweighed by the degree of unfair prejudice of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Evid.R. 404(B) prohibits the introduction of evidence of "other crimes, wrongs, or acts" to prove the character of a person and that he acted in conformity with that character. *See State v. Cotton*, 118 Ohio App.3d 125, 131, 680 N.E.2d 657 (1st Dist.1996).

{¶44} It is up to the trial court to decide initial questions of admissibility. Evid.R. 104(A). We will not disturb those rulings unless the trial court abused its discretion by admitting the evidence. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 172.

{¶45} We cannot say the trial court abused its discretion in determining the challenged evidence was relevant and more probative than prejudicial. The items proved Frazier had access to 9 mm ammunition, which was used in the crime, and

tended to show Frazier knew how to use firearms and carried them on his person. And because two guns had been fired during the incident, any one of Frazier's three missing guns could have been used in the shootings by his unidentified accomplice. Therefore, the probative value of this evidence was not outweighed by its danger of unfair prejudice. In any event, the evidence of Frazier's guilt was overwhelming. Thus, we are convinced that error, if any, in the admission of the evidence was harmless. We, therefore, overrule his second assignment of error.

### *Admission of the Cell-Phone-Tower Maps*

{¶46}   In his third assignment of error, Frazier contends the trial court erred in admitting cell-tower maps as business records, in violation of his Sixth Amendment right to confront witnesses.

{¶47}   At trial, Paula Papke, manager of the security office at Cincinnati Bell, testified that she manages the subpoena-compliance center and is the custodian for the Cincinnati Bell records. Exhibit M-1 listed all the cell phone towers and exhibit 2 listed the cellular activity for Frazier's phone, which had been provided to police pursuant to a search warrant. Frazier did not object to these two exhibits.

{¶48}   Papke testified regarding three other exhibits, M-3, M-4, and M-5. Papke testified that the engineering office had built all the cell phone towers into the Google Earth program and that Cincinnati Bell used the program for creating maps for various reasons.

{¶49}   Papke testified that at the prosecutor's request, she had mapped on M-3 the distance between cell tower 26 and the address of the shootings and the distance was .9 mile. On M-4 she mapped the distance of .8 mile between cell tower 38 and the address of the shootings. Papke further testified that the distance between the cell towers and the address of the shootings was accurate in both maps.

**{¶50}** Papke testified that M-5 depicted the location of cell tower 48 in relation to an address in Forest Park, where Frazier had been apprehended hours after the shooting. She testified that she generated the map, which reflected a distance of .9 mile from the location of the cell tower to the Forest Park address. Papke further testified that the three maps were generated by and kept in the ordinary course of business with Cincinnati Bell.

**{¶51}** Frazier's counsel objected to exhibits M-3, M-4, and M-5, but only on the basis that the maps lacked a scale. Counsel argued that absent such a scale there was not enough of a foundation to see what the distances on the maps were. Counsel did not object to the exhibits on the basis that they were inadmissible hearsay, which violated his constitutional right to confrontation, the only ground raised in this appeal. Following defense counsel's objection, the trial court required further questioning of Papke, but overruled the objection.

**{¶52}** Frazier's failure to object at trial on the specific grounds raised has forfeited the issue, limiting us to a plain-error analysis. Evid.R. 103(A)(1); *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240; *see* Crim.R. 52. Plain error is recognized only in exceptional circumstances to avoid a miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 94-95, 372 N.E.2d 804 (1978).

**{¶53}** Given our review of the record, we cannot conclude that the trial court's admission of the three exhibits rose to the level of plain error. The exhibits were demonstrative aids that were merely cumulative to Papke's testimony and to the properly admitted cell phone records. *See State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057. State's exhibit M-2, which was admitted at trial without objection, listed all the phone calls, including those made on Frazier's phone over the course of Christmas Day and the day following the shooting. That exhibit contained the date and time of the calls, the numbers involved in the calls, the type of

call, such as text message, phone call, or social data download, and the cell phone tower utilized for each particular call or message. State's exhibit M-1 contained all the addresses for Cincinnati Bell's cell phone towers.

{¶54} There is also no confrontation-clause problem. Papke testified as to the exhibits and was subjected to extensive cross-examination about the maps, including their lack of a scale, and how the signal from a person's cell phone is typically, but not always, transmitted to the tower closest to the person receiving the communication. As a result, we overrule the third assignment of error.

### Jury Instruction on Complicity

{¶55} In his fourth assignment of error, Frazier argues the trial court erred in instructing the jury on complicity, which violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution when the state's evidence at trial only supported the theory that he had acted as a principal offender.

{¶56} A jury instruction on complicity is warranted where the evidence demonstrates that an individual "acting with the kind of culpability required for the commission of an offense," aids or abets another in committing the offense. R.C. 2923.02(A)(2); *State v. Alexander*, 1st Dist. Hamilton No. C-110035, 2012-Ohio-460, ¶ 31. Complicity requires a showing "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 766 (2001), syllabus. Evidence of aiding and abetting may be demonstrated by both direct and circumstantial evidence. *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981).

{¶57} Here, there was ample evidence before the jury to warrant the complicity instruction. Deters testified that Frazier had exited from the back

passenger door of the driver's side of the SUV, and that Frazier and at least one other person had fired shots at Kyila and him. Griffin testified that she saw three men, who had jumped out of the SUV and had begun shooting at Kyila and Deters, and that the men had drug Kyila. Multiple gunshots were fired. Criminalists testified that 17 9 mm casings had been recovered. The firearms examiner testified that two of the casings had been fired from one weapon and 15 casings had been fired from another weapon. Deters had seen Frazier firing shots at the Touareg. Testimony revealed that Kyila, who had been standing at the back of the Touareg before Deters had driven off, had been shot four times. The coroner testified that all four shots had contributed to her death.

{¶58} Additionally, testimony from Regina and Bryant supported the theory that Frazier had acted with Germany in committing the offenses. Bryant testified that Frazier had told him that Germany had planned the hit, and that Frazier had merely followed his orders in carrying it out. Frazier admitted that following the confrontation with Kyila, he had left Linda's house with his father. Regina testified that after 30 minutes, Frazier had dropped Germany back at Linda Shield's home and had remained nearby. Thus, the state produced evidence from which a jury could have concluded that Frazier had acted in concert with Germany and others to commit the offenses. Thus, the trial court did not abuse its discretion in giving the complicity instruction. We, therefore, overrule the fourth assignment of error.

### *Motion for Mistrial*

{¶59} In his fifth assignment of error, Frazier alleges "the trial court erred by denying his motion for mistrial based upon prosecutorial misconduct in closing argument, which denied him his rights bestowed by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, resulting in the denial of a fair trial."

{¶60} "Mistrials need be declared only when the ends of justice so require and when a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). A trial court's decision to grant or deny a mistrial lies within its sound discretion and will not be disturbed on appeal absent an abuse of discretion. *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 42. An abuse of discretion connotes more than an error of law or an error in judgment; instead it implies that the trial court's attitude is arbitrary, unreasonable, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶61} During closing argument, defense counsel implied that Officer Burns's testimony about crime-scene visibility was coached. Counsel then pointed to a placard that set forth a quote from the American Bar Association Standards for Criminal Justice 3-1.1(c), which provided, "the duty of the prosecutor is to seek justice not merely to convict." At the conclusion of closing argument, defense counsel left the placard on an easel.

{¶62} During the rebuttal portion of closing argument, the assistant prosecutor, when discussing the credibility of Frazier's testimony, wrote on the placard, "Liars do not seek justice, but seek to avoid confrontation." Defense counsel objected to the assistant prosecutor's writing on the placard. The trial court stated, "It's too late." Continuing with his argument, the assistant prosecutor then threw the placard across the room and onto the floor. Defense counsel again objected. The trial court instructed the jury to disregard the prosecutor's conduct. The assistant prosecutor apologized for his conduct and immediately concluded his argument.

{¶63} After the trial court had instructed the jury, but before it had retired to deliberate, defense counsel moved for a mistrial at a sidebar conference, arguing the trial court's instruction had not cured the prejudice from the prosecutor's conduct. Defense counsel also asked the trial court to voir dire the jury. Following

argument by defense counsel and the state, the trial court denied both motions stating:

> Okay. Well, I think it was a little bit over the top, but not in a way that I think it prejudices the jury. I think we have citizens that are going to be capable of putting the evidence in context. They've heard a lot of evidence and I think that by the time there was an objection to writing on it he had already done it, and I don't think there was any prejudice. * * * Well the placard itself is argument. I think that the assistant prosecutor is correct that it is a fair statement. The only thing that I think is objectionable is perhaps you wanted to use that in your next case and now you can't. But as far as it being improper for him to write on it, I don't believe it was improper. * * * I don't think it is necessary to voir dire the jury. I gave them a cautionary instruction. I don't think any snickering came from the jury. We've got a lot of people in the gallery here. I don't think that it was inflammatory. I mean, I observed it, and I think it was in the passion of the moment that Mr. Leon did that, and I don't think that it's going to be taken by the jury as being something that indicates that the defendant is guilty if they see that the evidence doesn't support it.

{¶64} We find and the state agrees that while the assistant prosecutor's conduct was arguably inappropriate, his written comment on the placard was a fair statement about the evidence, and the trial court's instruction to the jury was sufficient to cure any prejudice that may have arisen as a result of the prosecutor's conduct. Frazier, moreover, has not demonstrated that the prosecutor's conduct denied him a fair trial such that the trial court abused its discretion in denying the motion for a mistrial where the jury actually acquitted Frazier of the aggravated-

murder count relating to Kyila, and the trial court's decision to deny the mistrial motion exhibited a sound reasoning process.

{¶65} Although Frazier argues this court should view the assistant prosecutor's conduct in writing on and throwing the placard together with a number of statements the assistant prosecutor made during closing argument, we decline to do so because Frazier did not object to any of those statements, and they did not form the basis of his motion for a mistrial. We, therefore, overrule the fifth assignment of error.

### Cumulative Error

{¶66} In his sixth assignment of error, Frazier argues the alleged errors assigned on appeal, even if individually harmless, had the cumulative effect of denying him a fair trial. In *State v. DeMarco*, 31 Ohio St.3d 191, 197, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, the Ohio Supreme Court held that "[a]lthough violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." Given that we have not found multiple instances of harmless error that denied Frazier a fair trial, we find the doctrine inapplicable. We, therefore, overrule the sixth assignment of error.

### Journal Entries

{¶67} In his seventh assignment of error, Frazier argues the trial court erred by failing to journalize an entry discharging the jury, following the first mistrial, and by failing to incorporate its statutory sentencing findings for consecutive sentences in the sentencing entry.

{¶68} We first address Frazier's argument that the trial court erred by failing to note the discharge of the jury, following the first mistrial, on the journal as required by R.C. 2945.36.

**{¶69}** Frazier cites to *State v. Syslo*, 11th Dist. Portage No. 658, 1976 Ohio App. LEXIS 6718, *3 (Apr. 19, 1976), where the Eleventh District Court of Appeals held that the trial court's failure to comply with R.C. 2945.36, by "fil[ing] a journal entry setting forth one of the statutory grounds for discharging a jury" exonerated the defendant "from the liability of further answering to the indictment and it was prejudicial error for the trial court to overrule the defendant's motion for discharge on the grounds of double jeopardy."

**{¶70}** But as the state points out, the *Syslo* case has not been cited by the Eleventh District, or any other appellate district, for this proposition. Instead, other appellate districts have applied a harmless-error analysis, where the trial court's reasons for ordering the mistrial, although not contained within a judgment entry of the court, are apparent from the record. *See State v. Morgan*, 129 Ohio App.3d 838, 842, 719 N.E.2d 102 (8th Dist.1998); *State v. Workman*, 60 Ohio App.2d 204, 209, 396 N.E.2d 777 (3d Dist.1977*); State v. Bell,* 12th Dist. Butler No. CA99-07-122, 2001 Ohio App. LEXIS 1915, *52-55 (Apr. 30, 2001)*.

**{¶71}** Here, the record reflects that Frazier was injured during the first trial when a female spectator stomped on Frazier's head with a high-heeled boot. Frazier sustained a concussion, and suffered dizziness, headache and memory loss. Shortly thereafter, defense counsel moved for a mistrial, stating that Frazier's medical condition impeded his ability to assist them in his defense. They also asked the court to order a competency evaluation. The state agreed that under the circumstances, a mistrial was warranted. The trial court granted the motion for a mistrial and ordered that Frazier's competency be evaluated. The trial court told Frazier's counsel and the assistant prosecuting attorney that once it had obtained the competency evaluation, it would schedule a court appearance to set another trial date.

{¶72} Here, any error in the trial court's failure to journalize an entry stating its reasons for discharging the jury is harmless. The record reflects that Frazier's first trial ended with a mistrial, which was declared at the request of defense counsel and with the concurrence of the state, and that Frazier was retried without objection. Thus, Frazier cannot demonstrate any prejudice from the trial court's failure to comply with R.C. 2945.36. *See Bell* at *52-54. As a result, we find his first argument meritless.

{¶73} We do find merit, however, in Frazier's next argument, regarding the trial court's failure to include the consecutive-sentencing findings in the sentencing entry. In *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus, the Ohio Supreme Court held that if a trial court imposes consecutive sentences, it must not only announce the requisite consecutive-sentencing findings at the sentencing hearing, but it must also incorporate those findings into the sentencing entry.

{¶74} The record reflects that the trial court stated the required findings for consecutive sentences during the sentencing hearing and it journalized a sentencing-findings worksheet that included these findings. But the trial court did not incorporate its consecutive-sentencing findings into the sentencing entry. We, therefore, remand the matter, so that the trial court can correct this clerical mistake by a nunc pro tunc entry. *See Bonnell* at ¶ 30; *State v. Davis*, 1st Dist. Hamilton No. C-140351, 2015-Ohio-775, ¶ 7-10. We sustain in part and overrule in part the seventh assignment of error, and we affirm the trial court's judgment in all other respects.

Judgment affirmed and cause remanded.

**HENDON, P.J.,** and **STAUTBERG, J.,** concur.

Please note:

The court has recorded its own entry this date.