[Cite as *State v. Garcia*, 2016-Ohio-4667.]

STATE OF OHIO       )           IN THE COURT OF APPEALS
                        )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

STATE OF OHIO                    C.A. Nos.     27810
                                         27811
        Appellee

        v.

                         APPEAL FROM JUDGMENT
ALEX GARCIA                ENTERED IN THE
                         COURT OF COMMON PLEAS
        Appellant           COUNTY OF SUMMIT, OHIO
                         CASE Nos.   CR 2014 03 0642 (E)
                                        CR 2014 06 1599

DECISION AND JOURNAL ENTRY

Dated: June 29, 2016

HENSAL, Presiding Judge.

**{¶1}** Defendant-Appellant, Alex Garcia, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** On February 5, 2014, someone broke into a townhouse on Pine Top Court in Coventry Township. Ed Kouri and his girlfriend lived there at the time and left home that morning to pick up Mr. Kouri's step-daughter from the airport. When they returned a few hours later, they discovered that someone had forced open their front door and had taken numerous items from their home. The items taken from Mr. Kouri's home included a unique Firestone Invitational duffle bag, jewelry, wristwatches, and several electronic devices.

**{¶3}** On February 26, 2014, someone broke into a townhouse on Swartz Road in Akron. Carlo Pelosi and his girlfriend resided there at the time and left for work early that

morning. When Mr. Pelosi returned that evening, he discovered that someone had forced their way through the side door of his home and had stolen numerous items. The items taken from Mr. Pelosi's home included a remote controlled helicopter, a Citizen watch, a set of speakers, several bottles of cologne, an MP3 player, and several other electronic devices.

{¶4} On March 4, 2014, someone broke into an apartment on Crestmont Court in Copley. Donna Swain and her husband resided there at the time and left that morning to go to the gym and to lunch. On her way out to the car, Ms. Swain observed a dark-colored, parked car that she had never seen before. She also observed two men inside the car. When she and her husband returned from their outing, the car was gone, and they discovered that someone had forced their way through the front door of their apartment. Numerous items were stolen from Ms. Swain's apartment, including an armoire, jewelry, a prescription bottle, hypodermic needles, and a blue storage container.

{¶5} The same day that the break-in occurred at Ms. Swain's apartment, another tenant in the same apartment complex walked in on an intruder in her apartment. Jane Burris lived in a first-floor apartment catty-corner to Ms. Swain and had just finished with her shower when she heard the glass sliding doors to her patio opening. Believing that her daughter had opened the doors, Ms. Burris stepped out into the living room to greet her. She then saw a tall man in a hoodie standing in her living room. The man fled when Ms. Burris screamed, and she ran after him. Ms. Burris saw the man climb into a black car with no front license plate. She noticed that there was another person in the car as well, but focused on trying to see the car's license plate. Although Ms. Burris was not able to see the car's rear license plate when the driver quickly pulled away, she was able to describe the car to the police. The police then viewed the

surveillance videos from the apartment complex and determined that the car Ms. Burris saw was a black Ford Focus station wagon.

{¶6} On March 6, 2014, someone broke into an apartment on Hunt Club Drive in Copley. Hilary Fichter and her fiancé lived there at the time and left for work early that morning. When Ms. Fichter returned later that evening, she discovered that her front door had been forced open. Numerous items were stolen from her home, including jewelry, a Guess watch, a television, and a Chase credit card that was meant to replace the card Ms. Fichter already had. Ms. Fichter had not yet activated the new credit card, but, shortly thereafter, saw fraudulent charges appear on her Chase account. Ms. Fichter indicated that someone had either used or attempted to use her card at two gas stations: a Marathon and a Duchess gas station. Both transactions occurred around 1:00 p.m. on March 6, 2014.

{¶7} Detective Mike Yovanno investigated the break-ins at Ms. Swain's, Ms. Burris', and Ms. Fichter's apartments. Following his initial investigation, he reviewed the surveillance footage from the gas stations where Ms. Fichter's credit card was used and notified other departments to be on the lookout for a black Ford Focus station wagon with a missing front license plate. The police soon traced a car matching that description to the home of a man named Pervis Agee.

{¶8} As a result of surveillance conducted at the home of Mr. Agee, related surveillance, and the footage from the gas stations, Detective Yovanno became interested in Mr. Agee's step-sons, Clinton and Donald Wilson, and an acquaintance of theirs, Mr. Garcia. Detective Yovanno learned that Clinton and Donald Wilson's aunt, Michelle Wilson, also resided at Mr. Agee's residence and frequently drove the black Ford Focus station wagon to Mr. Garcia's home. His interest in Mr. Garcia intensified when he discovered that another detective,

Detective Carl Blasdel, was investigating Mr. Garcia and one of Mr. Agee's other step-sons with regard to several stolen business checks.

{¶9} On February 17, 2014, Detective Blasdel received a call about a break-in at a residence on James Avenue in Springfield Township. The residence belonged to Bruce Williams and his fiancée, Whitney Phillips, who were out of town when the break-in occurred. Mr. Williams owned a construction company and kept the company's checks at the residence. Detective Blasdel learned that several checks that were stolen during the break-in had been cashed at an Akron convenience store a few days earlier by several different men. Mr. Garcia was one of the men who cashed one of the stolen checks.

{¶10} The police ultimately executed search warrants at the homes of Donald Wilson, Clinton Wilson, and Mr. Garcia. Their searches uncovered items taken from the homes of Mr. Kouri, Mr. Pelosi, Ms. Swain, and Ms. Fichter. In Criminal Case No. 2014-06-1599, Mr. Garcia was indicted on four counts of burglary, arising from the break-ins that occurred at each of their four residences. Meanwhile, in Criminal Case No. 2014-03-0642(E), he was indicted on one count of receiving stolen property in connection with his receipt of the business check belonging to Mr. Williams. After the trial court indicated its intention to try Mr. Garcia's cases together, he filed a motion to sever. The trial court ultimately denied his request, however, and the same jury heard both cases.

{¶11} At the conclusion of trial, the jury found Mr. Garcia guilty on all counts. The court sentenced him to a total of 16 years in prison on the burglary counts and 1½ years in prison on the receiving stolen property count, for a combined total of 17½ years in prison. Because Mr. Garcia's charges stemmed from two separate indictments, the court issued two separate

sentencing entries. Mr. Garcia filed appeals in both cases, and this Court consolidated his two appeals for purposes of briefing, argument, and decision.

{¶12} Mr. Garcia's appeal is now before this Court and raises five assignments of error for our review. For ease of analysis, we rearrange and consolidate several of the assignments of error.

II.

ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED GARCIA'S MOTION TO TRY HIS RECEIVING STOLEN PROPERTY CASE SEPARATELY FROM HIS BURGLARY CASE.

{¶13} In his third assignment of error, Mr. Garcia argues that the trial court erred when it refused to sever his burglary counts from his receiving stolen property count for purposes of trial. Because Mr. Garcia has not preserved his argument for appeal, we decline to address it.

{¶14} "[Criminal] Rule 14 * * * addresses the joinder of completely separate indictments." *State v. Hatfield*, 9th Dist. Summit No. 23716, 2008-Ohio-2431, ¶ 14. "A defendant claiming prejudice by the joinder of offenses may move for severance under [the Rule]." *State v. Bennett*, 9th Dist. Lorain No. 12CA010286, 2014-Ohio-160, ¶ 9, quoting *State v. Merriweather*, 9th Dist. Lorain No. 97CA006693, 1998 WL 239773, *3 (May 6, 1998). "A motion to sever made under Criminal Rule 14, however, requires that the defendant renew [his] motion either at the close of the State's case or at the conclusion of all the evidence." *State v. Bean*, 9th Dist. Summit No. 26852, 2014-Ohio-908, ¶ 26. "A renewal of the motion is necessary because a [Criminal Rule] 14 analysis examines any prejudice resulting from the joinder in light of the evidence introduced at trial." *State v. Hoffman*, 9th Dist. Summit No. 26084, 2013-Ohio-

1021, ¶ 8. If a defendant fails to renew his motion, he forfeits the issue for appeal, save for a claim of plain error. *See Bean* at ¶ 27.

**{¶15}** Although Mr. Garcia filed a pre-trial motion to sever his burglary counts from his receiving stolen property count, the record reflects that he failed to renew his motion at either the close of the State's case or at the conclusion of all the evidence. *See Bean* at ¶ 26. "Because [he] failed to renew his objection to the allegedly prejudicial joinder, he has forfeited all but plain error on appeal." *Bennett* at ¶ 12. Mr. Garcia has not, however, presented us with a claim of plain error. "[T]his Court will not construct a claim of plain error on a defendant's behalf if the defendant fails to argue plain error on appeal." (Internal quotations and citations omitted.) *Id.* Because Mr. Garcia forfeited his severance argument for appeal and has not argued plain error, we decline to address the merits of his argument. His third assignment of error is overruled.

ASSIGNMENT OF ERROR IV

GARCIA'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE, AND MUST BE REVERSED.

**{¶16}** In his fourth assignment of error, Mr. Garcia argues that his burglary convictions are based on insufficient evidence. Specifically, he argues that there was no evidence that he trespassed in any of the victims' homes or that he was complicit in the burglaries that occurred in their homes. We disagree.

**{¶17}** Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In making this determination, we must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind

of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶18} The burglary statute provides, in relevant part, that "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense." R.C. 2911.12(A)(2). A theft offense occurs when a person, "with purpose to deprive the owner of property[,] * * * knowingly obtain[s] or exert[s] control over * * * the property * * * [w]ithout the consent of the owner * * *." R.C. 2913.02(A)(1). A trespass occurs when a person, "without privilege to do so, * * * [k]nowingly enter[s] * * * on the land or premises of another * * *." R.C. 2911.21(A)(1).

{¶19} "[A] defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission * * *." *State v. Herring*, 94 Ohio St.3d 246, 251 (2002). "To support a conviction for complicity by aiding and abetting * * * the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "The criminal intent of the aider and abettor 'can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed.'" *State v. Smith*, 9th Dist. Summit No. 25650, 2012-Ohio-794, ¶ 7, quoting *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, ¶ 13. "As with proof of any element of an offense, complicity may be proved by circumstantial evidence, which has the same probative value as direct evidence." *Smith* at ¶ 7.

{¶20} Ed Kouri testified that he and his girlfriend reside in a three-story townhouse on Pine Top Court. On the morning of February 5, 2014, the two left to pick up Mr. Kouri's step-daughter from the airport and did not return until sometime around noon. Mr. Kouri then saw that someone had broken in through their front door. He testified that, although he had installed a strong dead bolt on the door, "the whole casing for the door * * * was just destroyed * * *." When he went inside, he noticed that numerous items were missing from his home, including the upstairs television, jewelry, his laptop computer, a camera, and a unique duffel bag that he had left out for an upcoming trip. Mr. Kouri indicated that the bag was a souvenir from a golf outing that the University of Akron's Golf Team hosted at Firestone Country Club some 15 years prior. He testified that the bag was embroidered with the invitational logo and had not been available for sale. He also testified that he never gave Mr. Garcia, Clinton Wilson, or Donald Wilson permission to enter his home or take his duffle bag.

{¶21} Carlo Pelosi testified that he and his girlfriend reside in a townhouse on Swartz Road along with their dog. On the morning of February 26, 2014, Mr. Pelosi left for work and did not return home until about 6:15 p.m. He testified that his girlfriend left shortly after he did and that, while they were gone, they kept their dog in a crate. When Mr. Pelosi returned home, he entered through the garage door and was puzzled to see that lights had been left on in the house. He checked that the dog was still in its cage before he noticed that several of his possessions were missing. He then saw that someone had forced open the side door of his home. Mr. Pelosi testified that the items taken from his home included his television, computers, an MP3 player, bottles of cologne, a remote controlled helicopter, a Citizen watch, a money clip, several identification cards, and a set of speakers. He indicated that the screens on his speakers were missing because he had damaged them when he moved. Further, he testified that he never

gave Mr. Garcia, Clinton Wilson, or Donald Wilson permission to enter his home or take any of his possessions.

{¶22} Donna Swain testified that she and her husband used to live in an apartment on Crestmont Court. On the morning of March 4, 2014, Ms. Swain and her husband left their apartment to visit the gym and go to lunch. While walking out to the parking lot of their apartment complex, Ms. Swain saw a dark-colored car with "two dark, black men" inside. She indicated that she only looked at the car and the men in passing, but had never seen the car in the apartment complex before. She testified that, when she and her husband later returned home, the car was gone. Ms. Swain and her husband then saw that someone had broken through the frame of their front door to gain entry to their apartment. Ms. Swain's armoire and jewelry were gone, as was her prescription medication and a box of disposable syringes. Ms. Swain testified that she never gave Mr. Garcia, Clinton Wilson, or Donald Wilson permission to enter her home.

{¶23} In March 2014, Jane Burris lived in the same apartment complex as Ms. Swain and her husband. She testified that she missed work on March 4, 2014, to be with her adult daughter, who was staying with her at the time. Ms. Burris had just finished her shower and was still in the bathroom when she heard the sliding doors that led out to her patio open. Assuming that it was her daughter who had opened the doors, she stepped out of her bathroom to greet her. She testified that she then saw a man standing in her apartment. When Ms. Burris screamed, the man turned and ran. Ms. Burris then followed the man until she could see him climbing into a black car with no front license plate. Ms. Burris testified that she saw someone else was sitting in the car, but she focused on the car itself to try to see a license plate number. She watched as the driver quickly pulled away and then reported the incident to the police. Ms. Burris testified that the police arrived a short while later, at which point she learned that someone had also

broken into Ms. Swain's apartment. Ms. Burris described the man who came into her apartment as tall, but testified that she did not get a good look at his face because he had "a hoody on over his head." She testified that she thought the man "was a light-skinned black person," but admitted that, when she described the man to the police, she may not have mentioned that he was light-skinned.

{¶24} Hilary Fichter testified that she and her fiancé used to live in an apartment on Hunt Club Drive. On the morning of March 6, 2014, the two left separately for work. Mr. Fichter did not arrive back home until sometime around 11:00 p.m. She then saw that the wood surrounding her apartment door was splintered and the door was slightly open. After the police arrived, Ms. Fichter looked inside and saw that numerous items had been taken from her apartment. Those items included her Vizio television, several jewelry boxes, a Guess watch, and a replacement credit card from Chase bank. Ms. Fichter testified that she had not yet activated the credit card, but soon saw transactions that she did not make appear on her Chase account. The two transactions both occurred on March 6th at two separate gas stations. Ms. Fichter testified that she did not know Mr. Garcia or Donald Wilson and never gave them permission to enter her home or take her possessions.

{¶25} Detective Mike Yovanno investigated the break-ins at the apartments belonging to Ms. Swain, Ms. Burris, and Ms. Fichter. He testified that Ms. Burris was upset when she spoke with him, but able to tell him that she thought the man who broke into her apartment was a black male. Ms. Burris also indicated to Detective Yovanno, however, that the man's face had been partially covered by a hood that he was wearing over his head. When asked about Ms. Burris' testimony that the man who came into her apartment was tall, Detective Yovanno confirmed that Mr. Garcia is several inches taller than Donald Wilson, who is about 5'7" to 5'8" tall.

{¶26} Detective Yovanno viewed surveillance footage from the apartment complex where Ms. Swain and Ms. Burris resided and, in conjunction with the statements the two ladies gave, identified a 2001-2002, black Ford Focus station wagon as a vehicle of interest. He testified that there were less than five of those types of vehicles registered in the county, so he notified local police departments to be on the lookout for one with a missing license plate. Meanwhile, he obtained surveillance footage from the two gas stations where someone used Ms. Fichter's stolen Chase credit card.

{¶27} Detective Yovanno testified that the two gas stations where someone used Ms. Fichter's stolen credit card were both located on East Avenue in Akron and were very close to one another. The first gas station was a BP Duchess station, and the second was a Marathon gas station. Detective Yovanno contacted the managers from each station and, using Ms. Fichter's credit card number, they were able to identify the time and date that someone used her credit card at their respective stations. They then provided the detective with the surveillance footage from that time period.

{¶28} According to Detective Yovanno, the BP station was the first place that someone attempted to use Ms. Fichter's credit card. The surveillance footage from that station showed a blue Chevy Caprice parked at one pump and a black Ford Focus station wagon parked at another pump. Detective Yovanno testified that the credit card transaction that someone attempted at the BP station failed. Following that failed transaction, however, a successful transaction occurred at the nearby Marathon gas station.

{¶29} Detective Yovanno testified that the surveillance footage from the Marathon gas station depicted a black Ford Focus station wagon leading a blue Chevy Caprice into the lot. Once the Chevy Caprice parked at a gas pump, the male passenger of the Ford Focus exited the

station wagon and approached the driver of the Chevy Caprice near the credit card swipe located on the gas pump where the Chevy Caprice was parked. The passenger from the Ford Focus then returned to the station wagon.

{¶30} Detective Yovanno testified that another police department helped him trace a black Ford Focus station wagon with a missing license plate to a man named Pervis Agee. Mr. Agee was an Akron resident and had two vehicles registered to him: a black Ford Focus station wagon and a blue Chevy Caprice. Detective Yovanno learned that Mr. Agee lived with several other people, including his wife, his step-son, Clinton Wilson, and Clinton Wilson's aunt, Michelle Wilson. He also learned that Clinton had a brother named Donald, who resided elsewhere in Akron. Detective Yovanno testified that his department conducted surveillance at Mr. Agee's home, as well as at the home of Donald Wilson. He stated that, while the blue Chevy Caprice was registered to Mr. Agee, Donald Wilson drove the car and kept it at his residence. He further stated that, while the black Ford Focus was registered to Mr. Agee, Michelle Wilson frequently drove the car. Detective Yovanno learned that Ms. Wilson had a romantic relationship with Mr. Garcia and drove the Ford Focus to his residence on numerous occasions.

{¶31} Detective Yovanno testified that he was present when the police eventually executed search warrants at the homes of Clinton Wilson, Donald Wilson, and Mr. Garcia. At Clinton Wilson's home, the police discovered, among other things, a Citizen watch, a set of speakers, a money clip, and several identification cards bearing the name of Carlo Pelosi. While testifying at trial, Mr. Pelosi identified the watch, speakers, and money clip, as matching the items taken from his home. At Donald Wilson's home, the police discovered, among other things, prescription medication bearing the name of Donna Swain, disposable syringes, a

significant amount of jewelry, watches, and a 47-inch Vizio television. Detective Yovanno testified that the television the police found at Donald Wilson's house matched the description of Ms. Fichter's stolen television. At Mr. Garcia's home, the police discovered, among other things, jewelry and watches, including a Guess watch, cologne, an MP3 player and other electronics, a remote controlled helicopter, and a Firestone duffle bag. Detective Yovanno confirmed that: (1) the Firestone duffle bag matched the bag that Mr. Kouri had reported stolen; (2) the MP3 player, cologne, and remote controlled helicopter matched the items that Mr. Pelosi had reported stolen; and (3) the Guess watch matched the stolen watch that Ms. Fichter had purchased her fiancé for Christmas.

{¶32} Clinton Wilson testified that he met Mr. Garcia through his brother Donald Wilson. Mr. Wilson identified his aunt, Michelle Wilson, as one of Mr. Garcia's girlfriends and testified that she owned a black Ford Focus station wagon. According to Mr. Wilson, both his aunt and Mr. Garcia drove the station wagon and his brother Donald had driven it at least once or twice. He also testified that his fiancée, Marci Brown, owned a gray Buick LeSabre and sometimes allowed Mr. Garcia to borrow it when neither he, nor she needed it.

{¶33} Mr. Wilson testified that, on February 26, 2014, Mr. Garcia asked him for a ride to a girlfriend's house to retrieve some of his possessions. According to Mr. Wilson, he picked up Mr. Garcia in Ms. Brown's Buick LeSabre and followed Mr. Garcia's driving directions. It was mid-day when they arrived at a complex that housed either condominiums or apartments. Mr. Wilson testified that Mr. Garcia directed him to a particular residence and he parked right next to the front door. He then watched as Mr. Garcia entered the residence through the front door. According to Mr. Wilson, the door opened for Mr. Garcia as if it had been left unlocked.

He testified that Mr. Garcia emerged a few minutes later with a bag, pillow case, and a television. Mr. Wilson stated that, while waiting for Mr. Garcia, he heard a dog barking.

{¶34} Mr. Wilson testified that, on another occasion, he visited Mr. Garcia's home and saw a Citizen watch lying on one of the tables in the house. According to Mr. Wilson, he asked Mr. Garcia if he could have the watch and Mr. Garcia agreed. Consequently, Mr. Wilson took the watch home with him when he left. Later that same day, he and Ms. Brown allowed Mr. Garcia to bring his children to their home because the water had been turned off at his residence. Mr. Wilson stated that Mr. Garcia arrived carrying his possessions in a Firestone duffle bag. He testified that Mr. Garcia also brought a set of speakers with him because Mr. Wilson's speakers had been damaged. According to Mr. Wilson, Mr. Garcia left the speakers in the attic when he left with his children. The police later seized the speakers from Mr. Wilson's home, and Mr. Pelosi testified that the speakers matched the ones taken from his home.

{¶35} Mr. Wilson acknowledged that the police seized other stolen items from his home, such as Mr. Pelosi's identification card. He testified, however, that he unknowingly brought those items into his home when he cleaned out a Chevy Tahoe that used to belong to Mr. Garcia. According to Mr. Wilson, he assumed ownership of the Tahoe from Mr. Garcia, but a number of items had been left inside it when Mr. Garcia gave it to him. Mr. Wilson testified that he put all of the items in a bag and brought the bag into his house.

{¶36} Mr. Garcia argues that his burglary convictions are based on insufficient evidence because the State failed to prove that he trespassed in any of the victims' homes. He notes that there was no physical evidence tying him to any of the break-ins. According to Mr. Garcia, evidence that he may have possessed items taken from some of the victims' homes was not enough to show that he either trespassed in their homes or aided and abetted another trespasser.

{¶37}  Viewing the evidence in a light most favorable to the State, we must conclude that the State set forth evidence from which a rational trier of fact could have found that Mr. Garcia either trespassed or aided another in trespassing in each of the four homes at issue.  The State presented evidence of several similarities between the break-ins that occurred at the homes of Mr. Kouri, Mr. Pelosi, Ms. Swain, and Ms. Fichter.  First, each burglary occurred during daylight hours after each occupant had either left for work or for another engagement.  Second, in each instance, the intruder(s) forced open a door instead of a window or other access point.  Third, in each instance, the intruder(s) targeted electronics, jewelry, and/or watches.  Combined with additional evidence, the jury reasonably could have concluded that the same person or persons committed each burglary.

{¶38}  Ms. Burris testified that the man who fled her apartment climbed into a black car where another person was already sitting, and Ms. Swain observed two men sitting in a dark-colored car outside her apartment when she and her husband left that morning.  As such, the jury reasonably could have concluded that two men were involved in the break-ins that occurred at Ms. Swain's and Ms. Burris' apartments.  Two days later, Ms. Fichter's credit card was stolen and used shortly thereafter at a Marathon gas station.  Surveillance footage from the Marathon depicted a male passenger exiting a black Ford Focus station wagon and approaching the driver of a blue Chevy Caprice at the gas pump.  There was evidence that the driver of the station wagon had just led the Chevy Caprice to the Marathon from a different gas station where someone had tried unsuccessfully to use Ms. Fichter's credit card.  Accordingly, the jury reasonably could have concluded that the passenger of the black Ford Focus station wagon had Ms. Fichter's credit card.  The jury also reasonably could have concluded that the station wagon's passenger and driver were both involved in the break-in that occurred at Ms. Fichter's

apartment a short time beforehand. Finally, the jury reasonably could have concluded that Donald Wilson was not an occupant in the station wagon, as there was testimony that he drove a blue Chevy Caprice.

{¶39} Clinton Wilson testified that, on February 26, 2014, he gave Mr. Garcia a ride to an apartment/townhouse complex and watched as Mr. Garcia went inside and came back with a television and other items. Although Mr. Wilson claimed not to have seen Mr. Garcia force his way through any doors to gain access to the home, he did testify that he heard a dog barking while Mr. Garcia was inside. There was testimony that Mr. Pelosi had a dog and that the break-in at his townhouse occurred that same day. Moreover, the police later found items that matched Mr. Pelosi's stolen possessions at the homes of Mr. Garcia and Clinton Wilson. Indeed, there was testimony that the police found a remote controlled helicopter that matched the description of Mr. Pelosi's in Mr. Garcia's dining room. Given the foregoing, the jury reasonably could have concluded that Mr. Garcia had Mr. Pelosi's property because he burglarized his home.

{¶40} When the police seized evidence from Mr. Garcia's house, they found items that matched the items stolen from the homes of Mr. Kouri, Mr. Pelosi, and Ms. Fichter. Additionally, Clinton Wilson testified that most, if not all, of the items the police seized from his house were there either because Mr. Garcia brought the item to the house (i.e., the speakers that matched Mr. Pelosi's), Mr. Wilson took the item from Mr. Garcia's house (i.e., the Citizen watch that matched Mr. Pelosi's), or Mr. Wilson brought the items into his house when he cleaned out the Chevy Tahoe that had belonged to Mr. Garcia. Mr. Wilson further testified that when Mr. Garcia visited on one occasion he brought along a Firestone duffle bag. Mr. Kouri testified that the Firestone duffle bag the police seized from Mr. Garcia's house matched the unique bag that had been taken from his apartment. Once again, the jury reasonably could have concluded that

Mr. Garcia had Mr. Kouri's, Mr. Pelosi's, and Ms. Fichter's property in his possession because he either burglarized or aided and abetted another individual in burglarizing their homes.

{¶41} "Circumstantial evidence and direct evidence inherently possess the same probative value * * *." *Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus. Although the State was unable to produce any physical evidence or eyewitness testimony definitively placing Mr. Garcia at the scene of the break-ins, the State set forth a wealth of circumstantial evidence implicating Mr. Garcia. Viewing all of that evidence in a light most favorable to the State, we cannot conclude that Mr. Garcia's burglary convictions are based on insufficient evidence. As such, his fourth assignment of error is overruled.

ASSIGNMENT OF ERROR V

GARCIA'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED.

{¶42} In his fifth assignment of error, Mr. Garcia argues that his convictions for burglary and receiving stolen property are against the manifest weight of the evidence. We disagree.

{¶43} If a defendant asserts that his convictions are against the manifest weight of the evidence,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Weight of the evidence pertains to the greater amount of credible evidence produced in a trial to support one side over the other side. *Thompkins*, 78 Ohio St.3d at 387. An appellate court should only exercise its power to reverse a

judgment as against the manifest weight of the evidence in exceptional cases. *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

**Burglary**

{¶44} Mr. Garcia argues that his burglary convictions are against the manifest weight of the evidence because the evidence does not tend to show that he actually took part in the burglaries that occurred here. He once again asserts that his possession of stolen items, standing alone, is not proof that he committed or was complicit in the commission of one or more burglaries. According to Mr. Garcia, Clinton Wilson was not a credible witness because his testimony varied from the statement he gave to the police and did not conform to the evidence. Further, Mr. Garcia notes that neither Ms. Swain, nor Ms. Burris indicated that they saw a Hispanic man on the day of the break-ins at their respective apartments. He argues that both women were close enough to the men they observed that they should have been able to accurately identify the race of the men.

{¶45} The record reflects that Clinton Wilson's testimony varied somewhat from the statement that he gave to the police after his arrest. Detective Jason Kline spoke with Mr. Wilson at jail and testified that Mr. Wilson described the residence where he drove Mr. Garcia on February 26, 2014, as a red, single-story ranch home with a white fence. Mr. Pelosi testified, however, that he resided in a townhome that was part of a larger complex. Moreover, while Mr. Pelosi testified that the side door of his townhouse had been forced open, Mr. Wilson testified that he watched Mr. Garcia walk through the front door of the home in question as if the door had been left unlocked. Mr. Wilson claimed that the seemingly unlocked door was one of the reasons that he did not become suspicious of Mr. Garcia's behavior that day.

{¶46} "'[I]n reaching its verdict, the jury is free to believe all, part, or none of the testimony of each witness.'" *State v. Gray*, 9th Dist. Summit No. 27365, 2015-Ohio-1248, ¶ 52, quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. Although not all of Mr. Wilson's testimony aligned with the other evidence the State presented at trial, several portions of it did. For instance, Mr. Wilson testified that he drove Mr. Garcia to an apartment or townhouse on February 26, 2014, and heard a dog barking while Mr. Garcia was inside the home. There is no dispute that the break-in at Mr. Pelosi's townhouse occurred that same day and that his dog was present when the break-in occurred. To the extent Mr. Wilson's testimony varied from his initial statement to the police or from the other evidence introduced at trial, the jury was in the best position to assess his credibility and was free to believe the portion(s) of his testimony that it found credible. *See State v. Pevnev*, 9th Dist. Lorain No. 13CA010473, 2015-Ohio-2628, ¶ 13. The jury was aware that the police seized some of Mr. Pelosi's stolen property from Mr. Wilson's house. As such, the jury could have chosen to believe that Mr. Wilson gave evidence against Mr. Garcia, but minimized his own involvement in the break-in(s). As previously set forth, Mr. Wilson's testimony was not the only basis for Mr. Garcia's convictions. The State also set forth a significant amount of other circumstantial evidence that implicated Mr. Garcia.

{¶47} We next address Mr. Garcia's argument that the jury lost its way in convicting him because neither Ms. Swain, nor Ms. Burris said that they saw a man of his race in the suspicious car they spotted or in Ms. Burris' apartment. Although neither woman said that they saw a Hispanic man, the record reflects that both had fleeting views of the men they saw. Ms. Swain testified that she glanced at a dark colored car from about twelve feet away and "didn't really take a good look at it[.]" She testified that she initially thought there was only one person

in the car, but saw another person when she turned to get in her own car and looked back. She repeatedly qualified that, while she noted both the car and the men, she only observed them in passing. Meanwhile, Ms. Burris stated that the man who broke into her apartment had his face partially covered by the hood of his hooded sweatshirt. At trial, she described the man as a "light-skinned black person." She testified that she did not get a good enough look at the man to be able to describe his face, but "knew enough to say it was, like, a black person." There is no dispute, however, that she observed the man's face only for a moment in a stressful situation when she had just emerged from the shower and realized that he had broken in.

{¶48} Mr. Garcia testified in his own defense at trial, so the jury was able to observe his demeanor and assess his credibility. Mr. Garcia testified that he was not involved in any of the four burglaries that occurred here, but, on several occasions, he purchased items such as iPads and laptops from Clinton and Donald Wilson so that he could resell the items for a profit. According to Mr. Garcia, on one of those occasions, Donald Wilson brought items to Mr. Garcia in a duffle bag and told Mr. Garcia that he could keep the duffle bag. As to the remote controlled helicopter that the police found in his dining room, Mr. Garcia testified that he had purchased the helicopter for his son for Christmas. Likewise, he testified that the bottles of cologne the police found at his house belonged to him, not to Mr. Pelosi. Mr. Garcia denied that he ever drove or rode in the black Ford Focus that Ms. Wilson frequently drove. He claimed that he was innocent of the burglaries with which he was charged and only "guilty for buying stuff" from Clinton and Donald Wilson. He admitted, however, that he had prior convictions for burglary and conspiracy to commit armed robbery.

{¶49} Having thoroughly reviewed the record, we cannot conclude that the jury lost its way when it convicted Mr. Garcia of four counts of burglary. The jury heard testimony that the

police found items from three of the victims' residences at Mr. Garcia's house. Additionally, they heard testimony that Mr. Garcia's girlfriend routinely drove the black Ford Focus station wagon that was spotted at the location of the fourth victim's apartment. Both Ms. Swain and Ms. Burris spotted two people in the Ford Focus, and surveillance footage from a different day showed the male passenger of a black Ford Focus station wagon using a stolen credit card to purchase gas for the driver of a blue Chevy Caprice. There was testimony that Donald Wilson drove a blue Chevy Caprice, such that the jury could have concluded that he was not the driver of the Ford Focus or the passenger who used the stolen credit card. Clinton Wilson testified that he saw Mr. Garcia enter and take items from an apartment/townhouse on the day that Mr. Pelosi's townhouse was burglarized. Additionally, he testified that the stolen items police found in his house were there as a result of Mr. Garcia. Although Mr. Garcia claimed that the stolen items the police found at his own house came into his possession because he purchased them from Clinton and Donald Wilson, the jury was free to reject his testimony. *See Gray*, 2015-Ohio-1248, at ¶ 52, quoting *Prince*, 2004-Ohio-7184, at ¶ 35. We have repeatedly held that "a conviction is not against the manifest weight because the jury chose to credit the State's version of the events." *State v. Mount*, 9th Dist. Summit No. 26941, 2014-Ohio-5334, ¶ 39, quoting *State v. Minor*, 9th Dist. Summit No. 26362, 2013-Ohio-558, ¶ 28. Because Mr. Garcia has not shown that the jury lost its way by convicting him of four counts of burglary, we reject his argument to the contrary.

**Receiving Stolen Property**

{¶50} Revised Code 2913.51(A) provides that, "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Mr. Garcia was charged with

receiving stolen property as a result of his cashing a check that was stolen from a residence in Springfield Township.

**{¶51}** Bruce Williams testified that he is the owner of C. Riley Construction Company and that both he and his fiancée, Whitney Phillips, have authority to write checks for the company. In February 2014, Mr. Williams and Ms. Phillips were on an extended vacation in Florida. Mr. Williams testified that, while they were gone, Ms. Phillips' mother was checking in on their residence every few days. On February 16th or 17th, Ms. Phillips' mother notified her daughter and Mr. Williams that someone had broken into their home. Mr. Williams testified that approximately six to eight of his company's checks were stolen during the break-in and four of those checks were ultimately cashed. He testified that the cashed checks all bore Ms. Phillips' signature, but that the writing on the checks did not actually match her handwriting. One of those checks was made payable to Mr. Garcia. Mr. Williams' confirmed, however, that neither he, nor Ms. Phillips ever wrote a check to Mr. Garcia.

**{¶52}** Detective Carl Blasdel investigated the break-in that occurred at Mr. Williams and Ms. Phillips' residence. He testified that Mr. Williams and Ms. Phillips were able to review their business checking account and informed him that, on February 14, 2014, several of the checks stolen from their home were cashed at Starz Market in Akron. Detective Blasdel spoke with the owner of Starz Market and learned that the store kept records of the individuals who cashed checks there, including their pictures and copies of their licenses or other identification cards. He testified that one of the records he recovered from the store showed that Mr. Garcia had cashed a check in the amount of $832.54 from C. Riley Construction Company. Detective Blasdel then issued a warrant for Mr. Garcia and, following his arrest, spoke to him at the jail.

{¶53} Detective Blasdel testified that Mr. Garcia admitted that he had cashed the check for $832.54. Mr. Garcia told the detective that he received the check from a man named Leroy as compensation after having "worked hard" for several days doing construction. According to Detective Blasdel, Mr. Garcia repeatedly claimed ownership of the check during their conversation and never indicated that he knew the check was stolen. At trial, however, Mr. Garcia testified differently.

{¶54} At trial, Mr. Garcia testified that he accepted the C. Riley Construction Company check from Donald Wilson. According to Mr. Garcia, Mr. Wilson vouched for the check, but asked Mr. Garcia to cash it. In exchange for Mr. Garcia cashing the check, Mr. Wilson indicated that Mr. Garcia could keep $500 of the $832.54 check. Mr. Garcia testified that he "knew something was wrong with [the check], but [he] still cashed it" because he was not aware of any burglary and "didn't think it was going to lead to all this." On cross-examination, he admitted that he lied to Detective Blasdel and that, before trial, he never told anyone that he had gotten the check from Donald Wilson.

{¶55} Mr. Garcia argues that his conviction for receiving stolen property is against the manifest weight of the evidence because the evidence does not weigh in favor of the conclusion that he either knew or had reasonable cause to believe that the check he cashed was obtained through the commission of a theft offense. *See* R.C. 2913.51(A). Mr. Garcia notes that, in order to cash the check, he had to present his identification card and have his picture taken at the Starz Market. He argues that a reasonable person would not have cashed a check under those circumstances if they believed that it was stolen.

{¶56} Having reviewed the record, we cannot conclude that the jury lost its way when it convicted Mr. Garcia of receiving stolen property. There is no dispute that Mr. Garcia cashed

the check in question. Although Mr. Garcia claims that he did not know the check was stolen, he testified at trial that he "knew something was wrong with [the check]," but cashed it anyway. The check itself clearly bore the heading "C. Riley Construction" and was made payable to Mr. Garcia rather than having been endorsed to him through one or more signatories. Further, the jury heard testimony that Mr. Garcia lied to Detective Blasdel about the check, claiming that he had earned it as a result of his hard work. This is not the exceptional case where the jury lost its way by convicting Mr. Garcia. *See Carson*, 2013-Ohio-5785, at ¶ 32, citing *Otten* at 340. Accordingly, Mr. Garcia's fifth assignment of error is overruled.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED INTO EVIDENCE UNAUTHENTICATED RECORDS OF GARCIA'S CELL TELEPHONE CALLS, IN VIOLATION OF GARCIA'S RIGHTS UNDER THE CONFRONTATION CLAUSE.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ADMITTED INTO EVIDENCE EXPERT TESTIMONY THAT WAS BASED UPON INADMISSIBLE SUBSTANTIVE EVIDENCE.

{¶57} In his first and second assignments of error, Mr. Garcia argues that the trial court erred when it allowed the State to present evidence of unauthenticated cell phone records and expert testimony based upon those records. He argues that the admission of the records violated his rights under the Confrontation Clause. Further, he argues that the opinion tendered by the State's expert violated Evidence Rule 703 because it stemmed from the expert's review of inadmissible, substantive evidence (i.e., the unauthenticated cell phone records).

{¶58} "An accused's right to confront and cross-examine witnesses against [him] is guaranteed by the Sixth Amendment to the United States Constitution." *State v. Jordan*, 9th Dist. Summit No. 27005, 2014-Ohio-2857, ¶ 5, citing *Crawford v. Washington*, 541 U.S. 36, 54

(2004). Nevertheless, "the Confrontation Clause applies only to testimonial statements." *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 59. Testimonial statements are those created or "given with the 'primary purpose of creating an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. ___, 135 S.Ct. 2173, 2183 (2015), quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). "Because cell-phone records are generally business records that are not prepared for litigation and are thus not testimonial, the Confrontation Clause does not affect their admissibility." *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, ¶ 39. The foregoing rule of law depends, however, upon the existence of an evidentiary foundation, establishing that the phone records at issue are, in fact, business records. *See id.* at ¶ 39-42. A trial court errs by admitting cell phone records when the proponent of those records has not authenticated them in accordance with Evidence Rule 803(6). *Id.*

{¶59} At Mr. Garcia's trial, the court allowed the State to present the testimony of a Lawrence Carlisle, a radio frequency engineer for Sprint. Mr. Carlisle testified that he was asked to review Mr. Garcia's cell phone records in order to track his approximate location at the time he either made or received several phone calls. He testified that a cell phone signal will connect to one sector of a particular cell tower when a user places or receives a call. If the user remains stationary, his or her cell phone should continue to rely on the same sector until the call ends. If the user is mobile, the signal from his or her cell phone may seamlessly connect with a different sector of the same tower or a different tower, depending on the user's location and the range of the surrounding sectors and towers. Accordingly, Mr. Carlisle testified that he could approximate a cell phone user's location by identifying the sector(s) with which the user's phone connected and calculating the size of that/those particular sector(s). The State relied upon Mr. Carlisle's expert testimony as evidence that Mr. Garcia was in an area near where the four

burglaries occurred on the specific dates and around the approximate times that those burglaries likely occurred.

**{¶60}** Detective Jason Kline testified that the police subpoenaed Mr. Garcia's cell phone records from Sprint. After the police received the records, they identified the calls that occurred on the days of the four burglaries and placed the information from those calls on a disc. They then gave the disc to Mr. Carlisle, who used it to conduct his analysis and form his opinion. Mr. Carlisle explained that he cannot retrieve cell phone records himself if they are more than 90 days' old because Sprint archives those records. He further explained that, once records are archived, someone from Sprint's corporate office handles requests for those records. The State did not, however, subpoena anyone else from Sprint to testify. As such, the State never offered the testimony of a record keeper to authenticate the cell phone records and verify that they were prepared in the ordinary course of business. *See* Evid.R. 803(6).

**{¶61}** The State argues that it was unnecessary to subpoena a record keeper from Sprint because, despite not being a record keeper, Mr. Carlisle was otherwise qualified to authenticate the records he reviewed by virtue of his familiarity with Sprint's system. *See Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, at ¶ 40, quoting 5 McLaughlin, *Weinstein's Federal Evidence*, Section 803.08[8][a] (2d Ed.2009). We need not decide, however, whether Mr. Carlisle was qualified to authenticate the cell phone records here. That is because, even assuming that he was not and that the trial court erred by admitting his testimony, the record reflects that the court's error was harmless beyond a reasonable doubt. *See Hood* at ¶ 43.

**{¶62}** Constitutional error is harmless beyond a reasonable doubt "'if the remaining evidence, standing alone, constitutes overwhelming proof of [the] defendant's guilt.'" (Alteration sic.) *Id.*, quoting *State v. Williams*, 6 Ohio St.3d 281 (1983), paragraph six of the

syllabus. As noted, the State offered Mr. Carlisle's testimony for the purpose of showing that Mr. Garcia was in an area near where the four burglaries occurred on the specific dates and around the approximate times that those burglaries likely occurred. That testimony had no bearing on Mr. Garcia's conviction for receiving stolen property. Accordingly, the only question is whether, absent Mr. Carlisle's testimony, the record contains overwhelming proof in support of his burglary convictions.

{¶63} Initially, we note that the contribution that Mr. Carlisle's testimony made to the State's case against Mr. Garcia was, at best, marginal. Mr. Carlisle freely admitted that he could not pinpoint a cell phone user's exact location. Instead, he testified that he could approximate where the user was located within a sector, but qualified that sectors can be one to several square miles in size. He also admitted that several of the cell sectors implicated in this case involved highways, major roadways, and large shopping centers. Accordingly, if a victim's residence was located in the same sector as a highway or shopping center, Mr. Carlisle could not say whether Mr. Garcia's cell phone made or received a call from the victim's residence, a highway, or a shopping center. Moreover, because the burglaries could have occurred at any point in time between when the victims either left home for the entire day or for several hours, it was not possible for the State to prove that the calls took place when the burglaries actually occurred. Mr. Carlisle's testimony merely placed Mr. Garcia's cell phone in the general area of each of the four burglaries at some point in time on the days that the burglaries occurred.

{¶64} As to the other evidence the State presented at trial, we have already concluded that Mr. Garcia's burglary convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. In reaching those conclusions, we did not consider Mr. Carlisle's testimony. Instead, we examined the other evidence in the record and determined that

the State set forth a significant amount of circumstantial evidence in support of Mr. Garcia's burglary convictions. We thoroughly outlined that testimony and evidence above and will not do so again. It is our conclusion that, absent Mr. Carlisle's testimony, "the remaining evidence * * * constitutes overwhelming proof of [Mr. Garcia's] guilt." *Hood* at ¶ 43, quoting *Williams* at paragraph six of the syllabus. As such, even assuming that the trial court erred by admitting Mr. Carlisle's testimony, that error was harmless beyond a reasonable doubt. Mr. Garcia's first and second assignments of error are overruled.

## III.

**{¶65}** Mr. Garcia's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

SCHAFER, J.
BALDWIN, J.
CONCUR.

(Baldwin, J., of the Fifth District Court of Appeals, sitting by assignment.)

APPEARANCES:

JACQUENETTE S. CORGAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.